1   Peter Roldan (SBN 227067)
    Jason Fisher (SBN 289085)
2   EMERGENT LLP
    5 Third Street, Suite 1000
3   San Francisco, California 94103
    p: 415/894-9284
4   f: 415/276-8929
5   e: peter@emergent.law
    e: jason@emergent.law
6
7   Attorneys for Plaintiffs
    RICHARD KOMAIKO and
8   MARCIE COOPERMAN

9                   UNITED STATES DISTRICT COURT

10                NORTHERN DISTRICT OF CALIFORNIA

11                     SAN FRANCISCO DIVISION

12

13

14  RICHARD KOMAIKO and            | Case No. 4:19-cv-03795-DMR
    MARCIE COOPERMAN, on behalf of |
15  themselves and others similarly situated, | **CLASS ACTION**
                                   |
16        Plaintiffs,              | **FIRST AMENDED COMPLAINT FOR**
                                   | **DAMAGES AND INJUNCTIVE**
17  v.                             | **RELIEF PURSUANT TO THE**
                                   | **TELEPHONE CONSUMER**
18  BAKER TECHNOLOGIES, INC. and   | **PROTECTION ACT, 47 U.S.C. §§ 227**
    TILT HOLDINGS INC.             | ***et seq.* AND CAL. BUS. & PROF.**
19                                 | **CODE § 17200 *et seq.***
20        Defendants.              |
                                   | **DEMAND FOR JURY TRIAL**
21

22

23

24

25

26

27

28

FIRST AMENDED CLASS ACTION COMPLAINT                    Case No. 4:19-cv-03795-DMR

Plaintiffs Richard Komaiko ("Mr. Komaiko") and Marcie Cooperman ("Ms. Cooperman") (together, "Plaintiffs"), husband and wife, bring this action against Defendants Baker Technologies, Inc. ("Baker") and Tilt Holdings Inc. ("Tilt") (together, "Defendants") for their roles in sending text messages in violation of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227 et seq., and California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 et seq.  Plaintiffs advance the action by and through their attorneys, Emergent LLP, Foster Graham Milstein & Calisher, LLP, and Allen Vellone Wolf Helfrich & Factor P.C., and on behalf of all others similarly situated.  Plaintiffs complain and allege as follows upon personal knowledge as to their own acts and experiences, and, as to all other matters, upon information and belief, including their attorneys' investigation.

## I.    INTRODUCTION

1.    The TCPA was passed in response to voluminous consumer complaints about telemarketing abuses, in recognition that unrestricted telemarketing can be an intrusive invasion of privacy, and in order to provide some control over telemarketing practices.  *See* Pub. L. 102-243, § 2, at paras. 5, 10, 12, 13, 105 Stat. 2394 (1991); *Van Patten v. Vertical Fitness Group, LLC*, 847 F.3d 1037, 1043 (9th Cir. 2017).

2.    Since the Act's passage, however, the number of telemarketing calls made to Americans has only multiplied, and unwanted calls remain the FCC's top consumer complaint.  *See*, *e.g.*, FCC, *Stop Unwanted Robocalls and Texts* (2019), https://www.fcc.gov/consumers/guides/stop-unwanted-robocalls-and-texts.

3.    Telemarketing abuses only proliferated as text messaging took hold and smart phones became ubiquitous.  *See*, *e.g.*, Tara Siegel Bernard, *Yes, It's Bad.  Robocalls, and Their Scams, Are Surging.*, N.Y. Times, May 6, 2018; You Mail, *Robocall Index* (2019), https://robocallindex.com.

4.    This is because telemarketers and their service providers, like Baker, understand:

Just about everyone has a mobile phone with them at all times.

FIRST AMENDED CLASS ACTION COMPLAINT                    Case No. 4:19-cv-03795-DMR

> Mobile phones are glued to our hip – 68 percent of us even keep our cell phones next to us while we sleep! . . .  Unlike emails, most people read their text messages within a matter of minutes or even seconds. . . .  Only 23 percent of emails are read, while 98 percent of texts are opened, and the conversion rate is 12x higher.

Baker, *Should Dispensaries Use SMS Marketing?* (2019), https://www.trybaker.com/ blog/should-dispensaries-use-sms-marketing; Baker, *Why Texting Is The Most Powerful Tool For Your Dispensary* (2019), https://www.trybaker.com/blog/why-texting-is-the-most-powerful-tool-for-your-dispensary.

**A.    The TCPA, Telemarketing Texts, and Common Carrier Liability**

5.    The TCPA places certain restrictions on telemarketing text messages.  A text is a "call" under the Act.  *See Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 952 (9th Cir. 2009).

6.    The TCPA states:

> It shall be unlawful for any person . . . to make any call (other than a call made for emergency purposes or made with the prior consent of the called party) using any automatic telephone dialing system ["ATDS"] . . . to any telephone number assigned to a . . . cellular telephone service.

47 U.S.C. § 227(b)(1)(A)(iii).

7.    With regard to text messages, an ATDS is any equipment that has (1) the capacity to either (a) store numbers to be texted or (b) produce numbers to be texted using a random or sequential number generator, and (2) dial such numbers automatically, even if a person must turn on or trigger the system.  *See Marks v. Crunch San Diego, LLC*, 904 F.3d 1041, 1053 (9th Cir. 2018).

8.    For telemarketing texts – *i.e.*, those intended to encourage the purchase of goods or services – the "prior consent of the called party" must be express and in writing.  *See* 47 C.F.R. § 64.1200(a)(1)(iii)-(2); § 64.1200(f)(1) & (12).

9.    Valid "prior express written consent" consists of

> an agreement, in writing, bearing the signature [(including an electronic or digital form of signature valid under applicable federal or state contract law)] of the person called that clearly authorizes the [specific] seller to deliver . . . telemarketing messages using an ATDS, and the telephone number to which

2.

the signatory authorizes such . . . messages to be delivered.

47 C.F.R. § 64.1200(f)(8); *In the Matter of Rules and Regulations Implementing the TCPA of 1991*, 27 FCC Rcd. 1830, 1843, at paras. 32-33 (Feb. 15, 2012).

10.    Further, said "agreement" must

> include a clear and conspicuous disclosure informing the person signing that: [b]y executing the agreement, such person authorizes the [specific] seller to deliver . . . telemarketing calls using an ATDS; and the person is not required to sign the agreement, . . . or agree to enter into such an agreement as a condition of purchasing . . . goods[] or services.

*Id.*

11.    "Common carriers" are immune from TCPA liability unless they have a "high degree of involvement or actual notice of an illegal use and fail to take steps to prevent such transmissions."  *In the Matter of Rules and Regulations Implementing the TCPA of 1991*, 7 FCC Rcd. 8752, 8780, at para. 54 (Oct. 16, 1992) (citing *In the Matter of Enforcement of Prohibitions Against the Use of Common Carriers for the Transmission of Obscene Materials*, 2 FCC Rcd. 2819, 2820, at para. 9 (May 15, 1987)).

12.    A "telecommunications carrier," such as an ATDS provider, is treated as a common carrier to the extent it is engaged in providing telecommunication services.  47 U.S.C. § 153(51).

13.    The FCC has only ever expounded on what constitutes a "high degree of involvement" for purposes of excepting immunity from TCPA liability for common carriers when discussing "fax broadcasters."  *In re Rules and Regulations Implementing the TCPA of 1991*, 21 FCC Rcd. 3787, 3808, at para. 40 (Apr. 6, 2006); *Rules and Regulations Implementing the TCPA of 1991*, 68 Fed. Reg. 44144, 44169, at para. 138 (July 25, 2003).

14.    In doing so, the FCC indicated a "high degree of involvement" exists where a fax broadcaster (1) supplies the numbers used to transmit the advertising messages; (2) is a source of those numbers; (3) makes representations about the legality of transmitting to those numbers; (4) advises a client about how to comply with the law; or (5) reviews, assesses, or determines the content of a message.  *Id.*

15.     Citing the aforementioned FCC guidance, federal courts have also found that a "high degree of involvement" exists when a broadcaster "controls the recipient lists [and/or] the content of the transmissions." *See*, *e.g.*, *Rinky Dink, Inc. v. Electronic Merchant Systems*, No. 13-1347, 2015 WL 778065 (W.D. Wash. Feb. 24, 2015).

16.     A declaratory ruling and order the FCC issued in 2015, which clarified "who makes[/initiates] a call" under the TCPA and is thus liable for any TCPA violations" on that basis, *see In the Matter of Rules and Regulations Implementing the TCPA of 1991*, 30 FCC Rcd. 7961, 7978-84, at paras. 25-37 (July 10, 2015) ("Depending upon the facts of each situation, these and other factors . . . can be relevant in determining liability for TCPA violations."), *Spiegel v. EngageTel Inc.*, No. 15CV1809, 2019 WL 1399975, at \*7 (N.D. Ill. Mar. 28, 2019) (""That the FCC discussed some factors more than others in its [2015] analysis indicates that what factors are most relevant depends on the facts and circumstances of the case."), did nothing to diminish the relevance of the "high degree of involvement" standard for ascertaining whether a common carrier's immunity from TCPA liability should be excepted, *see*, *e.g.*, *Linlor v. Five9, Inc.*, No. 17CV218, 2017 WL 2972447, at \*4 (S.D. Cal. July 12, 2017); *Allard v. SCI Direct, Inc.*, No. 16-cv-01033, 2017 WL 2957883, at \*3-4 (M.D. Tenn. July 10, 2017); *Payton v. Kale Realty, LLC*, 164 F. Supp. 3d 1050, 1057-60 (N.D. Ill. 2016).

17.     Rather, the FCC's 2015 guidance broadened the inquiry applicable to common carriers involved in text transmissions to encompass the "totality of the facts and circumstances surrounding the placing of [] particular call[s]." *In the Matter of Rules and Regulations Implementing the TCPA of 1991*, 31 FCC Rcd. 88, 90-92, at paras. 5-8 (Jan. 11, 2016); *In the Matter of Rules and Regulations Implementing the TCPA of 1991*, 30 FCC Rcd. 7961, 7978-84, at paras. 25-37 (July 10, 2015).  This measure effectively provides a lower threshold for excepting the TCPA immunity afforded to such entities than the "high degree of involvement or actual notice of an illegal use and fail[ure] to take steps to prevent such transmissions" standard, with the former encompassing the latter.  *See In the Matter of Rules and Regulations Implementing the TCPA of 1991*, 31 FCC Rcd. 88, 90-92,

4.

1   at paras. 5-8 (Jan. 11, 2016); *In the Matter of Dialing Services, LLC*, 29 FCC Rcd. 5537,

2   5542-44, at paras. 16-21 (May 8, 2014).

3        18.     Consequently, if a common carrier, like Baker, had a high degree of

4   involvement in transmitting a text message, it should necessarily be deemed to have

5   made/initiated the text pursuant to the "totality of the facts and circumstances" standard,

6   and be open to liability under the TCPA on that basis.  *See In the Matter of Rules and*

7   *Regulations Implementing the TCPA of 1991*, 31 FCC Rcd. 88, 90-92, at paras. 5-8 (Jan.

8   11, 2016); *In the Matter of Rules and Regulations Implementing the TCPA of 1991*, 30

9   FCC Rcd. 7961, 7978-84, at paras. 25-37 (July 10, 2015).  Put another way, Plaintiffs assert

10  that TCPA liability extends to Baker under both or either the "totality of the

11  circumstances" test and/or the "high degree of involvement" standard.

12       **B.**     **Baker's Operations and Services**

13       19.     "Baker is the leading [customer relationship management services provider

14  []CRM[]] for the cannabis industry, helping dispensaries grow their business and build

15  relationships with their customers."  Baker, *Home Page* (2019) https://www.trybaker

16  .com.

17       20.     It provides services to more than 1,100 client dispensaries throughout the

18  United States, *see* Carrie Pallardy, *Cannabis Software Company Baker Sees Promise in*

19  *Tilt Holdings B2B Platform*, New Cannabis Ventures, Dec. 10, 2108, and "servic[es] over

20  30 percent of dispensaries across the United States and Canada," Baker, *Home Page –*

21  *Video* (2019), https://www.trybaker.com.

22       21.     "Baker helps dispensaries generate more revenue . . . through a variety of

23  products featuring online ordering, customer loyalty, messaging, and analytics," offering

24  dispensaries the opportunity to "drive revenue with one easy-to-use platform."  Baker,

25  *Webinar - Dispensary Marketing: From Application to Expansion* (2019), https://www.

26  trybaker.com/webinars/recording/dispensary-marketing-application-to-expansion?

27  hsCtaTracking=b23089e2-4202-48fb-a603-b3bf2146500b%7C852ff79d-ef7a-4505-9cfd-

28  416e5a7075b0; Baker, *Home Page* (2019), https://trybaker.com.

22.     A key aspect of this platform are software applications that "effortlessly collect customer information in-store and from [dispensaries'] website[s]."  Baker, *Home Page*, (2019) https://trybaker.com.

23.     One such application, "Cell Checkin," is run on tablets – *e.g.*, iPads – client dispensaries receive from Baker for in-store use "ready to go."  Baker, *Checkin* (2019), https://www.trybaker.com/products/checkin.

24.     Another, "Cell Collect," is used on an online ordering system Baker maintains for client dispensaries, and embedded in client dispensaries' websites.  Baker, *Webinar - Dispensary Marketing: From Application to Expansion* (2019), https://www.trybaker.com/webinars/recording/dispensary-marketing-application-to-expansion?hsCtaTracking=b23089e2-4202-48fb-a603-b3bf2146500b%7C852ff79d-ef7a-4505-9cfd-416e5a7075b0; Baker, *Collect* (2019), https://www.trybaker.com/products/collect.

25.     Those, and/or other similar applications Baker has provided, harvest cell phone numbers from client dispensaries' customers in-store, at events, and online.  Before otherwise interacting with client dispensaries, customers are directed to interface with Baker's cell phone number intake applications.  *See* Baker, *Checkin* (2019), https://www.trybaker.com/products/checkin; Baker, *Collect* (2019), https://www.trybaker.com/products/collect.

26.     These applications build lists of client dispensaries' customers' cell phone numbers, linking them with other streams of customer information.  *See* Baker, https://www.trybaker.com/products/connect.

27.     The lists, in turn, underpin another principal component of Baker's platform: messaging.  *See id.*

28.     Baker's "Connect" application merges data sorting functions with an ATDS, allowing client dispensaries to send texts messages to thousands of customers, and permitting them to view various criteria relating to the listed cell phone numbers.  *Id*.  Client dispensaries send telemarketing texts to their customers using this application.  *See id*.

6.

29.     With respect to Connect, Baker supplies, procures, and controls the necessary software, computers, telecommunications, services, and automated dialing capabilities needed to make/initiate texts.

30.     Baker offers technical services to assist client dispensaries in using Connect to send telemarketing text messages.

31.     Baker reviews the cell numbers to which texts are to be sent via Connect to determine if they contain enough digits to be valid numbers and informs client dispensaries of the total number of text messages that will be made/initiated.

32.     Baker also employs a "customer success team" that works with client dispensaries to evaluate the effectiveness of text messages, to help them understand and determine the best time to send text messages in order to reduce the unsubscribe rate on text messages, to determine the types of deals to offer in messages, and to revise the content of text messages in order to increase effectiveness.

33.     While client dispensaries may generate text content, and enter dates and times they want texts to be made/initiated, Baker stores the drafted text messages on servers owned, leased, or otherwise under its control, and Baker alone – through the electronic running of its software – actually dials the recipient cell phone numbers and makes/initiates the texts.

34.     Baker provides information to client dispensaries concerning the "reach, clicks, [click through rate (]CTR[)], and Checkins" for every telemarketing text client dispensaries send through Connect.  Baker, *Connect* (2019), https://www.trybaker.com /products/connect.

35.     Baker stresses the importance of text-based marketing to client dispensaries and potential client dispensaries.  It declares:

> Text messages are a particularly important medium for the cannabis industry.  [C]annabis businesses specifically should incorporate [them] as a core component of their marketing strategy because many other traditional marketing tactics are not feasible. . . .  Depending on local and state regulations, as a cannabis business, you likely cannot advertise on vehicles, billboards, at state fairs, in shopping malls, or in arenas.  In

7.

California, you can only advertise marijuana products if more than 71.6 of the viewers are 21 or older.

Baker, *Should Dispensaries Use SMS Marketing?* (2019), https://www.trybaker.com/blog/should-dispensaries-use-sms-marketing.

36.     Baker collaborates with client dispensaries to optimize the impact of text messages sent via Connect, suggesting, at a minimum, they be centered around loyalty programs, which are another pillar of Baker's platform, focus on customizable promotions and product notifications, and include hyperlinks to the online ordering system Baker provides.  In this way, Baker assists in determining the content of the telemarketing texts client dispensaries send to their customers.  *See generally* Baker, *Website* (2019), https://www.trybaker.com; *infra* at paras. 56-57, 70-72, 87-89.

37.     By running Cell Checkin, Cell Collect, and/or other similar applications to populate lists of customers client dispensaries can message with Connect, Baker is supplying the cell phone numbers used to transmit the telemarketing texts client dispensaries send.  It is a source of those numbers.

38.     Baker has conveyed to client dispensaries, through representations, omissions, or both, that numbers gathered via Cell Checkin, Cell Collect, and/or other similar applications may, without additional customer authorizations being obtained, be delivered telemarketing texts using Connect, and that such is lawful.

39.     This is so notwithstanding Cell Checkin, Cell Collect, and/or other similar applications did not source valid prior express written consent from customers for purposes of the TCPA until sometime in mid 2018, at the earliest.  *See infra* at para. 106.

## II.     FACTUAL BACKGROUND

### A.     Baker's Violative Activities Harm Plaintiffs

40.     Mr. Komaiko has received ATDS sent telemarketing texts from Baker client dispensaries Mile High Green Cross ("Mile High") of Denver, Colorado; Native Roots of Boulder, Colorado; and Purple Star MD ("Purple Star") of San Francisco, California.  Ms. Cooperman has received telemarketing text messages transmitted using an ATDS from Baker client dispensary Herban Legends of Seattle, Washington.  Baker was highly

8.

involved in those transmissions.  Neither Mr. Komaiko nor Ms. Cooperman gave valid prior express written consent to receive such communications from any of the aforementioned dispensaries.

       1.   <u>Mile High</u>

41.    Mr. Komaiko received telemarketing texts from Mile High between June 18 and September 13, 2016.  He was sent at least 13 such messages during that time period. *See* Exhibit 1.

42.    The texts sent from Mile High appeared on Mr. Komaiko's cell phone as if transmitted from three different numbers, (720) 463-2220, (720) 580-5535, and (303) 647-5536.  *See id.*

43.    Baker determined the numbers the text messages would be delivered from to prevent them from being filtered or rejected, and to mask the use of an ATDS.  This is known as "spoofing."

44.    The telemarketing texts from Mile High included content like "Mile High Green Cross 852 Broadway – MHGC. Sale! Recreational $150 Oz. Out the door. Select Strains. While supplies last." *Id.*

45.    Mr. Komaiko received at least eleven telemarketing text messages from Mile High while he was located in the Northern District of California.

46.    He incurred charges from his cellular carrier, Verizon Wireless, for receiving at least one of the telemarketing texts sent from Mile High while he was in Morocco.  These charges amounted to several cents.  The charges were separate from Mr. Komaiko's "unlimited plan" and related uniquely to his receipt of Mile High texts.  *See* Exhibit 2.

47.    Mr. Komaiko has visited Mile High only once.  He did so in person in April 2016.

48.    During this visit, he interfaced with a tablet or computer employing a version of Cell Checkin, Cell Collect, or another similar Baker application approximating those described below at paragraphs 76 and 106.

9.

49.     Mr. Komaiko entered his cell number into the Baker application.  That is the only time at, and the only way in, which he conveyed that number while visiting Mile High.

50.     Mr. Komaiko did not have occasion to interact with Mile High in any capacity, including online, after his lone April 2016 visit.

51.     He never gave valid prior express written consent to receive telemarketing texts from Mile High.

52.     Yet, after Baker's application gathered Mr. Komaiko's cell phone number, it was made available to Mile High to message using Connect, Baker's ATDS offering, and Mile High sent him telemarketing texts.

53.     All of the telemarketing text messages Mr. Komaiko received from Mile High were delivered using Connect.

54.     When Baker provided his cell number to Mile High, Mile High understood from Baker, based on Baker's representations, omissions, or both, that it could lawfully send telemarketing texts to Mr. Komaiko at that number.

2.     <u>Native Roots</u>

55.     Mr. Komaiko received a telemarketing text from Native Roots on October 13, 2016.  On his cell phone, it appeared as if the text was sent from the number (720) 399-1301. *See* Exhibit 3.

56.     Baker determined the number the text message would be delivered from to prevent it from being filtered or rejected, and to conceal the use of an ATDS.

57.      The message from Native Roots stated: "Welcome to online ordering at Native Roots Boulder! Visit our online menu for availability, pricing, and photos here: http://tbkr.com/nrb - powered by Baker." *Id*.  The "http://tbkr.com/nrb" hyperlink included in the text established an association with Baker and its website, "trybaker.com," and linked to the online ordering function Baker maintained for Native Roots.  *Id*.

58.     Baker recommended Native Roots include the hyperlink and "powered by Baker" language in its telemarketing messaging.

10.

FIRST AMENDED CLASS ACTION COMPLAINT                    Case No. 4:19-cv-03795-DMR

1      59.     Mr. Komaiko has visited Native Roots' only once, doing so in person in April

2   2016.

3      60.     While in the dispensary, he interfaced with a tablet or computer running a

4   version of Cell Checkin, Cell Collect, or another similar Baker application approximating

5   those described *infra* at paragraphs 76 and 106.  He inputted his cell number into the

6   Baker application.

7      61.     That is the only time at, and the only manner in, which Mr. Komaiko

8   conveyed that number while interacting with Native Roots.

9      62.     Mr. Komaiko did not interact with Native Roots in any capacity, including

10   online, after making his one April 2016 visit.

11      63.     He never provided valid prior express written consent to receive

12   telemarketing texts from Native Roots.

13      64.     Despite that, after Baker's application harvested Mr. Komaiko's cell phone

14   number, it was made available to Native Roots to message using Connect, Baker's ATDS

15   element, and Native Roots did so.

16      65.     The telemarketing text Mr. Komaiko received from Native Roots was

17   delivered using Connect.

18      66.     When Baker supplied Mr. Komaiko's cell phone number to Native Roots,

19   Native Roots understood from Baker, based on Baker's representations, omissions, or

20   both, that it could lawfully transmit telemarketing texts to him at that number.

21              3.    Herban Legends

22      67.     From December 9, 2016 to October 25, 2018, Ms. Cooperman received at

23   least 121 telemarketing texts from Herban Legends. *See* Exhibit 4.

24      68.     These messages appeared on Ms. Cooperman's cell phone as if sent from

25   three different numbers, (206) 317-5707, (206) 557-6117, and (844) 374-6905.  *See id.*

26      69.     Baker decided from which numbers the texts would be sent to prevent them

27   from being filtered or rejected, and to disguise the use of an ATDS.

28

11.

FIRST AMENDED CLASS ACTION COMPLAINT                           Case No. 4:19-cv-03795-DMR

70.     The texts from Herban Legends included content, such as "Bondi Farms In Store Today @ Herban Legends from 4p to 7p – receive 20% off all their products while supplies last! [] https://tbkr.co/f-m6b"; "IndigoPros are back in stock!! Get your favorite new Vape while supplies last! @herbanlegends 55 Bell st https://tbkr.co/-datw"; and "@Herban Legends – NEW FALL DAILY SPECIAL ADDITIONS: 510 Fridays (Cartridges, excludes disposables, PAX & AiroPro) & Soothing Saturday (Topicals)! [] https://tbkr.co/8xef6b4." *Id.*

71.     The vast majority of the messages Ms. Cooperman received from Herban Legends contained hyperlinks to "tbkr.co," drawing an association with Baker and its website, "trybaker.com," and linking to the online ordering function Baker managed for Herban Legends. *See id.*

72.     Baker suggested Herban Legends include these hyperlinks in its telemarketing texts.

73.      Ms. Cooperman received at least one telemarketing text message from Herban Legends while within the Northern District of California.

74.     She has visited Herban Legends only one time, doing so in person on either December 8 or 9, 2016.

75.     During her visit, Ms. Cooperman interfaced with a tablet employing a version of Cell Checkin or another similar Baker application.

76.     Her experience consisted of the following:

      a.  Viewing a page on the tablet with the Herban Legends' logo at the top and Baker's at the bottom, and stating, "Welcome to Herban Legends. Tap to start earning points for discounts and rewards."

      b.  After "tapping," another page on the tablet was transitioned to.  This page showed the Herban Legends and Baker logos at its top and bottom, respectively, a number key pad, and stated, "Enter your cell number."  At the bottom of the page, above the Baker logo, in relatively small size, the following language was displayed: "Message and data rates may apply.

12.

Click here for [Terms and Conditions (]ToCs[)].  Consent is not a condition of purchase.  An autodialed marketing message will be sent to the number provided.  No purchase necessary.  Information collected in connection with this program will be used in accordance with the Baker Privacy Policy."  Hyperlinks provided access to the terms and conditions and privacy policy.  Those documents related to Baker, not Herban Legends.

c.  Upon her cell phone number being inputted, a new page was called forth.  This page again had the Herban Legends and Baker logos positioned at the top and bottom of the page.  The page also displayed a number of discount options and stated, "Tap a reward to redeem."  Finally, the page included a "Log Out & Save My Points" touch option.

d.  Pressing the Baker logo that appeared on the pages opened a separate page, which stated, "Baker.  Baker is the leading software partner for dispensaries across the country.  Visit trybaker.com or email us at info@trybaker.com for more information!"

Exhibit 5.

77.     This process did not result in Ms. Cooperman's provision of valid "prior express written consent," as that term is understood under the TCPA, to receive telemarketing texts from Herban Legends, because, among other reasons, it did not present a clear and conspicuous disclosure, did not bear a signature, did not specify that more than one telemarketing message would be sent, did not reference an "agreement," and did not clearly and specifically authorize Herban Legends to deliver such messages (*i.e.*, the disclaimer referenced Baker, and linked to Baker's terms and conditions and privacy policy).

78.     The only instances, and the only way, in which Ms. Cooperman disclosed her cell phone number while visiting Herban Legends involved her entering it into the Baker application described above.

FIRST AMENDED CLASS ACTION COMPLAINT                    Case No. 4:19-cv-03795-DMR

79.   Ms. Cooperman did not interact with Herban Legends in any way, including online, other than during her one December 2016 physical visit to the dispensary.

80.   She never provided valid prior express written consent to receive telemarketing text messages from Herban Legends.

81.   Nevertheless, following Baker's application's gathering of her cell phone number, it was made available to Herban Legends to message using Connect, Baker's ATDS application, and Herban Legends availed itself of that opportunity.

82.   All of the telemarketing texts she received from Herban Legends were sent using Connect.

83.   When Baker delivered Ms. Cooperman's cell number to Herban Legends, Herban Legends understood from Baker, based on Baker's representations, omissions, or both, that it could lawfully send telemarketing texts to her at that number.

4.   Purple Star

84.   Baker expanded its business into the California market and provides technical support to its California client dispensaries. It did this, in part, with funding it sought from San Francisco-based venture fund and seed accelerator 500 Startups, which accepted Baker into its program and provided $125,000. 500 Startups gave Baker momentum, and it continued raising funds from other California-based venture capital firms, such as Poseidon Investment Management, Base Ventures, and XG Ventures.

85.   Baker's co-founder and former CEO, Joel Milton, splits his time between Denver, Colorado and San Francisco, California. After Baker merged into Tilt, Milton became the Senior Vice President of Business and Corporate Development for Tilt, which was also expanding into California.

86.   In an interview Milton gave to the National Cannabis Industry Association, he explained that Baker hosted a booth at the California Cannabis Business Conference, a local trade show for cannabis businesses.

87.   Baker and Tilt's expansion efforts have been successful. Tilt's post-merger efforts to reach California have "reached 100% penetration and consistent deliveries to

14.

every licensed dispensary in the California market." To accommodate this business, Tilt executed leases in Oakland and Los Angeles "to expand [their] footprint in that market by over 50,000 square feet" and, through its division Baker, trained customer support specialists to be knowledgeable about the local California cannabis markets. In this way and others Baker segments the client dispensaries' customers and makes the messages appear personalized.

88.    As part of its expansion, Baker engaged Purple Star as a client and forwarded telemarketing texts to California residents on its behalf.

89.    Mr. Komaiko received at least 108 such telemarketing texts from Purple Star between November 2, 2017 and April 17, 2018.  *See* Exhibit 6.

90.    The texts sent from Purple Star appeared on his cell phone as if delivered from three different numbers, (720) 399-1301, which was also the number from which he apparently received a telemarketing text from Native Roots, (415) 236-5527, and (844) 741-8119.  *See id*.

91.    The "415" area code is associated with the San Francisco, California area.

92.    Baker determined the numbers the messages would be sent from to prevent them from being filtered or rejected, and to mask the use of an ATDS.

93.    The telemarketing texts from Purple Star included content such as "DELIVERY SPECIAL!! From 11:30-4:30 ONLY – ALL DELIVERIES 15% OFF!! Order online or by Phone at 415-550-1515 [] https://tbkr.co/o4qv-"; "TUESDAY MEGAPROMO – 30% OFF PREORDER W PICK-UP & 20% OFF MEDICAL IN STORE – USE CODE "MEGAPROMO" PURPLE STAR USE LINK [] https://tbkr.co/ahnkw"; and "OMFG!! IT'S FRIDAY 20% OFF IN-STORE ON MEDICAL 25% OFF PRE-ORDERS WITH PICK-UP USE CODE: 25PICKUP TO SHOP https://app.trybaker.com/site/ct/5a7d. . . ." *Id*.

94.    These telemarketing texts include advertisements for cannabis deliveries, which Purple Star offers for free within a certain radius of San Francisco for a minimum purchase.

FIRST AMENDED CLASS ACTION COMPLAINT                    Case No. 4:19-cv-03795-DMR

95.     All but 3 of the telemarketing texts Purple Star sent Mr. Komaiko contained hyperlinks to "tbkr.co" or "app.trybaker.com," both of which served to spark an association with Baker and its website, "trybaker.com," and linked to the Baker maintained online ordering function for Purple Star.  *See id.* This allows customers of Purple Star to see what Purple Star has available at that moment and what they can reserve or order for pickup or delivery instantly.

96.     Baker recommended Purple Star include these hyperlinks in its messaging.

97.     Mr. Komaiko received at least one telemarketing text from Purple Star while he was present in the Northern District of California.

98.     He has visited Purple Star only once, doing so in person on February 24, 2015.

99.     During his visit, Mr. Komaiko completed a paper patient information form. He entered his cell phone number on the form.  Neither this form nor any other form or application he encountered at Purple Star related to the provision of prior express written consent to receive telemarketing texts from the dispensary.

100.    The only instance, and the only way, in which Mr. Komaiko disclosed his cell phone number while visiting Purple Star involved him writing it on the paper patient information form.

101.    Other than to contact Purple Star regarding its sending of telemarketing texts to him without his consent, Mr. Komaiko did not interact with the dispensary in any way, including online, other than during his February 24, 2015 visit.

102.    He never provided valid prior express written consent to receive telemarketing text messages from Purple Star.

103.    At some point after Mr. Komaiko visited Purple Star and before he received a telemarketing text from it, Purple Star became a Baker client dispensary.

104.    When Purple Star became a Baker client dispensary, Baker advised Purple Star about how the cell phone numbers Purple Star had access to could be employed to

1 | build a customer list with which to use Connect, Baker's ATDS function, and the legality of
2 | doing so.

3 |      105.    Each of the telemarketing texts Mr. Komaiko received from Purple Star was
4 | delivered using Connect.

5 |      106.    Mr. Komaiko retained counsel to help him address his receipt of
6 | unconsented to telemarketing texts from Purple Star.  During that counsel's investigation,
7 | occasion was had to interface with Cell Collect or another similar Baker application used
8 | with the Purple Star online ordering function Baker maintained for the dispensary in
9 | March 2018.  This experience consisted of the following:

10 |           a.  Viewing a page with a text box indicating one should "login" if he or she
11 |               "already [has] an account" or "sign up."

12 |           b.  Transitioning, after clicking "sign up," to a text box asking, "What's your
13 |               cell number?," providing spaces for the appropriate number of digits to
14 |               be entered, and offering a "next" click-on option.

15 |           c.  Upon entering the number (534) 429-4646 and clicking "next," the
16 |               appearance of a new text box, requesting the entry of one's "first name,
17 |               last name, and email [address]" in provided fields, along with another
18 |               "next" click-on option.

19 |           d.  After inputting the requested fields and clicking "next," another text box
20 |               opened, indicating, "Create a Baker password," and containing a line for
21 |               the entry of such, as well as a "finished" click-on option.

22 |           e.  Subsequent to entering a password and clicking "finished," a final text
23 |               box was displayed, stating, "Msg & data rates may apply.  Consent is not
24 |               a condition of purchase.  An autodialed marketing message will be sent
25 |               to the number provided.  Privacy Policy Terms & Conditions."  The
26 |               hyperlinks provided in that statement linked to Baker's, not Purple
27 |               Star's, privacy policy and terms and conditions.

28 | Exhibit 7.

FIRST AMENDED CLASS ACTION COMPLAINT           Case No. 4:19-cv-03795-DMR

107.     Completing that process would not have resulted in Mr. Komaiko, or anyone else, providing valid "prior express written consent" for purposes of the TCPA to receive telemarketing texts from Purple Star, because, among other things, it did not present a clear and conspicuous disclosure, did not bear a signature, did not specify that more than one telemarketing message would be sent, did not reference an "agreement," and did not clearly and specifically authorize Purple Star to deliver such messages (*i.e.*, the disclaimer linked to Baker's terms and conditions and privacy policy).

108.     Telemarketing texts were sent from Purple Star to the cell phone number inputted during the process undertaken as part of Mr. Komaiko's counsel's investigation and described above.

109.     With regard to the messages he received from Purple Star, the dispensary eventually presented Mr. Komaiko the explanation that he had, based on Baker's privacy policy and terms and conditions, provided Purple Star with prior express written consent to receive telemarketing texts from it indirectly when he interfaced with a Baker cell phone number intake application while visiting Native Roots.

110.     Baker provided Purple Star with that reasoning, disclosing to Purple Star information about Mr. Komaiko's interaction with Native Roots, and counseling Purple Star about the legality of transmitting to his cell phone number and how to comply with the TCPA.

**B.     Parties**

111.     Plaintiff Richard Komaiko is a resident of Los Angeles, California.  He received all of the text messages sent to him relevant in this action at cell phone number (708) 370-3139.  That number was assigned to a cellular telephone service, Verizon Wireless, which, in turn, designated it to Mr. Komaiko, at all times relevant to this action.

112.     Plaintiff Marcie Cooperman is a resident of Los Angeles, California.  She received all of the text messages sent to her relevant in this action at cell phone number (913) 908-4204.  That number was assigned to a cellular telephone service, Verizon

1   Wireless, which, in turn, designated it to Ms. Cooperman, at all times relevant to this

2   action.

3        113.   Defendant Baker Technologies, Inc. is a Delaware corporation with its

4   headquarters located in Denver, Colorado.

5        Baker/Tilt Merger

6        114.   Defendant Tilt Holdings Inc. is a publicly traded Canadian corporation with

7   its headquarters located in Boston, Massachusetts.

8        115.   Tilt is the product of a 2018 merger ("Merger") involving several cannabis

9   companies, including Baker, Briteside Holdings, LLC ("Briteside"), Sea Hunter

10  Therapeutics, LLC ("Sea Hunter"), Santé Veritas Holdings, Inc. ("SVT"), and 1167411 B.C.

11  Ltd. ("Finco").

12       116.   A Business Combination Agreement dated July 9, 2018 details the Merger

13  ("Merger Agreement").  *See* Exhibit 8.[1]

14       117.   The Merger Agreement states that Baker, Briteside, Sea Hunter, SVT and

15  Finco "seek to combine their respective companies[.]" *Id.*, at p. 1.

16       118.   Article 2 of the Merger Agreement details the "Business Combination" of the

17  companies (i.e. merger). *Id.*, at pp. 25-34.

18       119.   Both Tilt and Baker announced the Merger on November 26, 2018. *See,*

19  Exhibit 9; https://www.trybaker.com/press; https://investors.tiltholdings.com/press-

20  releases/detail/8/repeattilt-announces-us119m-capital-raise-and-completion.

21       120.   The press release states that Baker, Briteside, Sea Hunter, and SVT "are now

22  operating as a unified company under the name TILT Holdings, Inc." *Id.,* at p. 1.

23       121.   Tilt's Chief Executive Officer commented: "[a]fter an extensive process of

24  combining four previously independent companies while simultaneously addressing all

25  the requirements for being a publicly listed company, we are excited to announce the

26  completion of the merger[.]" *Id.*

27  _____

28  [1]     The Merger Agreement is over 200 pages long. Therefore, only select portions are attached
    hereto.

19.

122.　　As a result of the Merger, Tilt assumed the liabilities of Baker. *See*, Cal. Corp. Code §1107; C.R.S. §7-90-204; 8 Del. C. §259(a); N.Y. Bus. Corp. Law, § 906, subd. (b)(3); *Dayton v. Peck, Stow & Wilcox Co.,* 739 F.3d 690, 692 (1ˢᵗ Cir. 1984)(applying Massachusetts law); *No Cost Conference, Inc. v. Windstream Communications, Inc.,* 940 F. Supp. 1285, 1299-1300 (S.D. Cal. 2013); *See also, Delaware Ins. Guar. Ass'n v. Christiana Care Health Services, Inc.*, 892 A.2d 1073, 1078 (Del. 2006) (" [a] merger does not allow a predecessor corporation to avoid its pre-merger obligations.  Rather, the 'liabilities and duties of the respective constituent corporations shall thenceforth attach to … [the] surviving… corporation,  and may be enforced against it … as if … [the] debts, liabilities and duties had been incurred or contracted by it.'")(quoting 8 Del. C. § 259(a)).

123.　　Therefore, as a result of the Merger, Tilt is liable for the acts and omissions of Baker described herein.

## III.　JURISDICTION AND VENUE

124.　　The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, because the action involves the TCPA.

125.　　This Court also has original jurisdiction under 28 U.S.C. § 1332, as the amounts in controversy exceed the specified thresholds and the action is between diverse parties.

126.　　Pursuant to 28 U.S.C. § 1367(a), the Court has supplemental jurisdiction over the UCL claims raised, because they relate to the TCPA claims to a great extent.

127.　　This Court has specific personal jurisdiction over Defendants because they directed their actions at California and Plaintiffs' claims relate to those same actions.

128.　　Venue is proper in the Northern District of California under 28 U.S.C. § 1391(b)(2), as a substantial part of the events giving rise to Plaintiffs' claims occurred in the district.

## IV.　CLASS ACTION ALLEGATIONS

129.　　Plaintiffs reallege and incorporate by reference herein all allegations previously made in paragraphs 1-128 above.

20.

EMERGENT

130.    This class action is brought and may be maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure and Section 382 of the California Code of Civil Procedure.

131.    Two proposed Classes are defined as follows:

    a.  All persons in the United States and its Territories to whom Baker's client dispensaries sent one or more telemarketing texts utilizing an ATDS, where the recipient number used to deliver the text/s was entered into one of Baker's number collection applications prior to such a transmission, at any time in the period that begins four years from before the date of this complaint's filing to trial.

    b.  All persons in the State of California to whom Baker's client dispensaries sent one or more telemarketing texts utilizing an ATDS, where the recipient number used to deliver the text/s was entered into one of Baker's number collection applications prior to such a transmission, at any time in the period that begins four years from before the date of this complaint's filing to trial.

132.    Specifically excluded from the proposed Classes are Defendants, their officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint venturers, or entities controlled by Defendants, and their heirs, successors, assigns, or other persons or entities related to or affiliated with Defendants and/or their officers and/or directors, or any of them.

133.    The Judge assigned to this action and any member of the Judge's immediate family are also specifically excluded from the proposed Classes.

134.    The Class definitions may be expanded or narrowed by amendment or amended complaint as additional information is obtained through further investigation and discovery.

135.    The Classes are so numerous that joinder of all the members is impracticable.  Plaintiffs do not know the exact number of members in each Class but they

21.

1 | reasonably believe both groups to be in the several thousands.  Class members should be
2 | readily identifiable through records Baker maintains.

3 | 136.   The disposition of the claims of the Classes in a single action will provide
4 | substantial benefits to all parties and the Court.

5 | 137.   There are several well defined questions of law and fact common to Plaintiffs
6 | and the Class members.  Some of these common questions are:

a. Whether Baker's client dispensaries violated the TCPA by sending non-emergency, unconsented to telemarketing texts using an ATDS to any numbers assigned to a cell phone service?

b. Whether, to the extent such violations occurred, Baker had a high degree of involvement in the transmissions giving rise to them?

c. Whether Baker was so involved in transmitting the texts at issue as to be deemed to have made/initiated them?

d. Whether Baker conveyed to client dispensaries, through representations, omissions, or both, that numbers gathered through its applications could, without more, be sent telemarketing texts using an ATDS, and that such was lawful?

e. Whether Baker's cell number intake applications obtained client dispensaries' customers' valid prior express written consent to receive telemarketing texts from a specific seller using an ATDS?

f. Whether Baker's client dispensaries systematically sent unconsented to telemarketing text messages using an ATDS to persons based on Baker's representations, omissions, or both?

g. Whether members of the Classes suffered economic injury as a consequence of Baker's actions?

h. Whether the Class members are entitled to statutory damages?

i. Whether the members of the Classes are entitled to treble damages because Baker acted knowingly and/or willfully?

22.

1        j.    Whether Class members are entitled to restitution?

2        k.    Whether the Class members are entitled to injunctive relief?

3        138.    As a person who received more than 100 unconsented to telemarketing texts

4    from Baker client dispensaries after interfacing with Baker's cell phone number intake

5    applications, Mr. Komaiko's claims are typical of those of the members of the Classes in

6    that they arise from Baker's common course of conduct and are based on the same legal

7    and remedial theories.

8        139.    Mr. Komaiko will fairly and adequately represent and protect the interests of

9    the Classes.

10       140.    Plaintiffs have retained competent and experienced counsel who have

11   significant experience in complex, mass, and class action litigation, including consumer

12   actions.

13       141.    Plaintiffs and their counsel are committed to prosecuting this action

14   vigorously on behalf of the Class members.

15       142.    Neither Plaintiffs nor their counsel have interests that are contrary to or are

16   antagonistic to those of the members of the Classes.

17       143.    Baker has engaged in a common course of conduct towards Plaintiffs and the

18   Class members.  The common issues arising from this conduct that have impacted

19   Plaintiffs and the members of the Classes predominate over any individual issues.

20       144.    A class action is the superior method for the fair and efficient adjudication of

21   this controversy.

22       145.    The interest of individual members of the Classes in independently

23   controlling the prosecution of separate claims against Defendants is small because the

24   statutory damages and restitution figures available in an individual action for violation of

25   the TCPA and UCL are small.

26       146.    Here, class treatment is superior to multiple individual suits or piecemeal

27   litigation because it will conserve judicial resources, promote consistency and efficiency of

28   adjudication, provide a forum for small claimants, and deter illegal activity.

23.

147.    No unusual difficulties relating to the management of this case as a class action present themselves.

**V.     CAUSES OF ACTION**

**First Cause of Action**

**(Violations of the TCPA, 47 U.S.C. § 227 *et seq*.)**

148.    Plaintiffs reallege and incorporate by reference herein all allegations previously made in paragraphs 1-147 above.

149.    Mile High, Native Roots, and Purple Star sent telemarketing text messages to Mr. Komaiko without his prior express written consent, violating the TCPA, and causing him cognizable harm.  *See* 47 U.S.C. § 227(b)(1)(A)(iii); *Van Patten*, 847 F.3d at 1043.

150.    Herban Legends sent telemarketing texts to Ms. Cooperman without her prior express written consent, violating the TCPA, and causing her cognizable harm.  *See id.*

151.    Those dispensaries, as well as other Baker client dispensaries, sent telemarketing text messages to other members of the Classes without their prior express written consent, violating the TCPA, and causing them cognizable harm.  *See id.*

152.    Baker was highly involved in those unlawful transmissions, variously supplying numbers used to send telemarketing texts to Mr. Komaiko, Ms. Cooperman, and members of the Classes; acting as a source of such numbers; making representations about the legality of transmitting to those numbers; advising client dispensaries about how to comply with the TCPA; and providing guidance on the content of messages.  In addition, Baker determined the numbers the text messages would be delivered from to prevent them from being filtered or rejected, and to disguise the use of an ATDS; the Baker recommended hyperlinks included in the texts established associations with Baker and its website, and linked to the online ordering system Baker maintained for the client dispensaries, ensuring the text messages marketed both the client dispensaries and Baker; Baker supplied, procured, and controlled the necessary software, computers, telecommunications, services, and capabilities needed to make/initiate the text messages;

1   Baker provided technical services to assist client dispensaries in using Connect to send the

2   texts; Baker assessed the validity of recipient cell phone numbers, and reported to client

3   dispensaries on the total number of texts to be made/initiated and on the reach, clicks,

4   CTR, and "Checkins" associated with each of those text messages; and Baker stored the

5   texts on servers it owned, leased, or were otherwise under its control, and dialed the

6   numbers and actually made/initiated the texts via the electronic running of its software.

7   Baker also employs a "customer success team" that works with client dispensaries to

8   evaluate the effectiveness of text messages, to help them understand and determine the

9   best time to send text messages in order to reduce the unsubscribe rate on text messages,

10  to determine the types of deals to offer in messages, and to revise the content of text

11  messages in order to increase effectiveness.  Therefore, Baker was so involved in placing

12  the texts as to be deemed to have initiated them, and is liable for violating the TCPA.

13      153.    The foregoing acts and omissions of Baker constitute numerous and multiple

14  negligent, and knowing and/or willful, violations of the TCPA, including but not limited to

15  each and every one of the above-cited provisions of 47 U.S.C. § 227 *et seq.*

16      154.    As a result of the negligent violations, Plaintiffs and the members of the

17  Classes are entitled to an award of $500.00 in statutory damages for each and every such

18  violation.  47 U.S.C. § 227(b)(3)(B).

19      155.    As a result of the knowing and/or willful violations, Plaintiffs and the

20  members of the Classes are entitled to an award of $1,500 in statutory damages for each

21  and every such violation.  47 U.S.C. § 227(b)(3)(B)-(C).

22      156.    Plaintiffs and the members of the Classes are also entitled to and seek

23  injunctive relief prohibiting such conduct in the future.  47 U.S.C. § 227(b)(3)(A).

24                      **Second Cause of Action**

25          **(Violations of the UCL, Cal. Bus. & Prof. Code § 17200 *et seq.*)**

26      157.    Plaintiffs reallege and incorporate by reference herein all allegations

27  previously made in paragraphs 1-156 above.

28

FIRST AMENDED CLASS ACTION COMPLAINT                    Case No. 4:19-cv-03795-DMR

EMERGENT

158.    The UCL prohibits any "unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."

159.    Baker has contravened the UCL prohibition against engaging in "unlawful" acts and practices by, as set forth above, violating the TCPA, which constitutes a violation of California Business and Professions Code Section 17200. *See*, *e.g.*, *Drew v. Lexington Consumer Advocacy, LLC*, No. 16-cv-00200, 2016 WL 1559717, at *8 (N.D. Cal. Apr. 18, 2016).

160.    The foregoing acts and omissions of Baker also constitute "unfair" business acts and practices under the UCL, being substantially injurious to consumers; offensive to public policy; immoral, unethical, and oppressive; and unscrupulous, as the conduct's gravity outweighed its benefits.  Baker's actions, moreover, are sufficiently tethered to a violation of the TCPA.

161.    Additionally, Baker's acts and omissions constitute a violation of the UCL for aiding and abetting, as Baker knowingly participated in actions that furthered its client dispensaries' violations of the TCPA, and those dispensaries' TCPA violations could form the bases of causes of action against them for "unlawful" and "unfair" business practices under the UCL.

162.    Plaintiffs allege violations of consumer protection laws, as recounted above, resulting in harm to consumers.  Plaintiffs also describe above acts contrary to public policy relating to competition and conduct towards consumers.

163.    There were reasonable alternatives available to further Baker's legitimate business interests – *i.e.*, alternatives to the conduct described *supra*.

164.    Baker's conduct caused substantial harm to Plaintiffs and other members of the Classes.  Mr. Komaiko, and likely other Class members, have suffered economic injury in the form of additional cell service charges because of Baker's actions.

165.    Baker has engaged in unlawful and unfair business acts, entitling Plaintiffs and the California Class to equitable relief.

1    166.    Plaintiffs and the members of the California Class are also entitled to and

2 seek injunctive relief prohibiting such conduct in the future.

3                                   **PRAYER**

4    Plaintiffs, on behalf of themselves and the Class members, pray for the following

5 relief:

6    a.    Certification of the Classes;

7    b.    Appointment of Plaintiff Richard Komaiko as Class representative;

8    c.    Appointment of the law firms representing Plaintiffs as Class counsel;

9    d.    An award of statutory damages;

10    e.    Treble damages according to statute;

11    f.    Restitution for any economic loss;

12    g.    An injunction barring Defendants from engaging in the illegal conduct

13         described herein;

14    h.    Attorneys' fees and costs; and

15    i.    Any other relief that this Court deems just.

16 Dated: October 25, 2019

18                          By:  /s/ Peter Roldan

19                                   Peter Roldan

20                          EMERGENT LLP
                            Attorneys for Plaintiffs
21                          RICHARD KOMAIKO and
                            MARCIE COOPERMAN