United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD KOMAIKO, et al., | Case No. 19-cv-03795-DMR |
| Plaintiffs, | |
| v. | **ORDER ON DEFENDANTS' MOTION TO DISMISS** |
| BAKER TECHNOLOGIES, INC., et al., | Re: Dkt. No. 34 |
| Defendants. | |

Plaintiffs Richard Komaiko and Marcie Cooperman are named representatives in this putative class action against Defendants Baker Technologies, Inc. ("Baker") and Tilt Holdings Inc. ("TILT"). [Docket No. 29 ("FAC").] Plaintiffs assert claims for violations of the Telephone Consumer Protection Act, 47 U.S.C. § 227 *et seq.* ("TCPA") and California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et. seq* ("UCL"). Defendants move to dismiss the operative complaint pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6). [Dockets No. 34 ("Mot."), 41 ("Reply").] Plaintiffs filed a timely opposition. [Docket No. 38 ("Opp.").] The court held a hearing on January 23, 2020.

For the reasons stated below, Defendants' Rule 12(b)(2) motion is granted in part and denied in part. Defendants' Rule 12(b)(6) motion is denied.

## I. BACKGROUND

Plaintiffs are residents of Los Angeles, California. FAC ¶¶ 111-12. Baker is a Delaware corporation with its principle place of business in Denver, Colorado. *Id.* ¶ 113; Docket No. 34-1, Declaration of Joel Milton in Support of Motion to Dismiss ("Milton Decl.") ¶ 2. TILT is a publicly-traded Canadian corporation with a principal place of business in Cambridge, Massachusetts. Docket No. 34-2, Declaration of Tim Conder in Support of Motion to Dismiss ("Conder Decl.") ¶

2.

## A.    Defendants' Corporate Relationship

On July 9, 2018, Baker entered into a Business Combination Agreement ("BCA") with Santé Veritas Holdings Inc., a Canadian corporation ("SVT"); Sea Hunter Therapeutics, LLC, a Delaware limited liability company ("Sea Hunter"); Briteside Holdings, LLC, a Tennessee limited liability company ("Briteside"), and 1167411 B.C. LTD., a British Columbia corporation ("Finco").[1] Defendants submitted a full copy of the BCA.  [Docket No. 34-4, Declaration of Cynthia A. Castillo in Support of Motion to Dismiss ("Castillo Decl."), Ex. A ("BCA").]  TILT Holdings, Inc. ("TILT Holdings") was organized and incorporated by SVT in Nevada to "effect the transactions contemplated" in the BCA.  BCA at 12.  In turn, TILT Holdings organized and incorporated TILT Holdings US, Inc. ("TILT US") as a Nevada corporation and as a wholly-owned subsidiary of TILT Holdings.[2]  BCA at 14.

The BCA contemplated that TILT Holdings would become a British Columbian corporation by way of conversion, and that Baker, SVT, Sea Hunter, Briteside, and Finco would be owned by TILT (the defendant in this action), the Canadian successor corporation to TILT Holdings.  BCA at 12, 15; *see also* Milton Decl. ¶ 11.  Specifically, the BCA intended that TILT would be the direct parent entity of Baker and SVT, while Baker would in turn be the parent entity of Sea Hunter and Briteside.  BCA at 15.  As part of this series of transactions, Baker merged with TILT US, with Baker continuing as the surviving corporation.  BCA at 3, 14; Milton Decl. ¶¶ 6, 9.  TILT's parent-subsidiary structure is reflected in the listing statement that TILT submitted to the Canadian Securities Exchange upon its conversion:

---

[1] Milton explains that Finco was "formed for the purposes of a concurrent financing."  Milton Decl. ¶ 8.

[2] The BCA refers to TILT Holdings as "Nevada HoldCo" and to TILT US as "Nevada MergeCo." *See* BCA at 12, 14.

United States District Court
Northern District of California

*Figure 1 - Pre-Business Combination*



*Figure 2 - Post-Business Combination (Partial)*



[Docket No. 40, Declaration of Peter Roldan in Opposition to Motion to Dismiss ("Roldan Decl."), Ex. B ("Listing Statement") at 16-17.]

      After the conversion, TILT formed Jimmy Jang, L.P., a Delaware limited partnership ("Jimmy Jang") for the purpose of acquiring a different limited liability corporation. Milton Decl. ¶¶ 6, 9. TILT owns approximately 85% of the limited partnership units of Jimmy Jang and the general partner of Jimmy Jang, Jimmy Jang Holdings Inc., is a wholly-owned subsidiary of TILT. *Id.* ¶ 9. Baker is now wholly owned by Jimmy Jang. *Id.* ¶ 15. In sum, TILT owns 85% of the partnership units of Jimmy Jang, and Jimmy Jang in turn owns 100% of Baker.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

3

**B.      Baker's Operations**

Baker provides a customer relationship marketing ("CRM") platform for over 900 cannabis dispensaries throughout Canada and the United States.  FAC ¶ 19; Milton Decl. ¶ 3.  Baker's software offerings include applications such as "Checkin," which collects customer information through an in-store tablet; "Cell Collect," which collects customer information through the client dispensaries' websites; and "Connect," which allows clients to send customers text messages through an automatic telephone dialing system ("ATDS").  FAC ¶¶ 22-24, 28.  Checkin and Cell Collect harvest consumer data such as cell numbers while Connect uses that data to send telemarketing texts.  *See id.* ¶¶ 22-28.

Plaintiffs allege that Baker "supplies, procures, and controls the necessary software, computers, telecommunications, services, and automated dialing capabilities needed to make/initiate texts" through Connect.  FAC ¶ 29.  Baker also offers technical support for Connect, verifies that the cell numbers provided by the consumers are valid, and tells the client dispensaries how many total text messages will be sent.  *Id.* ¶¶ 30-31.  Baker allegedly works with client dispensaries to "evaluate the effectiveness of text messages, to decide the best time to send text messages in order to reduce the unsubscribe rate on text messages, to determine the types of deals to offer in messages, and to revise the content of text messages in order to increase effectiveness."  *Id.* ¶ 32.  Plaintiffs aver that client dispensaries generate text content and tell Baker when they want the texts to be sent, while Baker stores the drafted text messages on its servers and sends the texts at the times and dates requested by the clients.  *Id.* ¶ 33.  Once the texts are sent, Baker provides data to the dispensaries about the reach of and responses to the messages.  *Id.* ¶ 34.  According to Plaintiffs, Baker has represented to its clients that collecting information and sending messages through its applications is legal.  *Id.* ¶ 38.  Plaintiffs claim that Baker's applications did not collect prior express consent from customers until sometime in mid-2018 at the earliest.  *Id.* ¶ 39.

The complaint alleges that Baker has "expanded its business into the California market," in part through funds from California-based venture capital firms.  FAC ¶ 84.  Plaintiffs claim that Joel Milton, the CEO of Baker, splits his time between San Francisco and Denver.  *Id.*  ¶ 85.  Baker has also allegedly hosted a booth at a California trade show for cannabis businesses.  *Id.* ¶ 86.

### C.    Text Messages

#### 1.    Colorado Dispensaries

In April 2016, Komaiko visited two cannabis dispensaries in Colorado: Mile High Green Cross ("Mile High") in Denver and Native Roots in Boulder.  FAC ¶¶ 47-49, 59-61.  During his single visit to each dispensary, he used "a tablet or computer employing a version of Cell Checkin, Cell Collect, or another similar Baker application."  *Id.* ¶¶ 48, 60.  He entered his cell number, which has an Illinois area code, into the application.  *Id.* ¶¶ 111.  After his visit to Mile High, he began receiving telemarketing texts from the dispensary, such as: "Mile High Green Cross 852 Broadway – MHGC. Sale! Recreational $150 Oz. Out the door.  Select Strains.  While supplies last."  *Id.* ¶¶ 41, 44.  He alleges that Mile High sent him at least 13 marketing text messages between June 18 and September 13, 2016, at least 11 of which he received while he was in the Northern District of California.  *Id.* ¶¶ 41, 45; *id.*, Ex. 1.  He received a single text message from Native Roots on October 13, 2016, which read: "Welcome to online ordering at Native Roots Boulder!  Visit our online menu for availability, pricing, and photos here: http://tbkr.com/nrb - powered by Baker."  *Id.* ¶¶ 55-57; *id.* Ex. 3.  The messages sent by Mile High and Native Roots came from at least four different numbers, all of which have Colorado area codes.  *See id.* ¶¶ 42, 55.  Komaiko avers that he never provided prior express written consent to receive telemarketing texts from either dispensary.  *Id.* ¶¶ 51, 63.

#### 2.    Washington Dispensary

On December 8 or 9, 2016, Cooperman visited the Herban Legends dispensary in Seattle, Washington, which is another Baker client.  FAC ¶¶ 40, 74.  During that visit, she used a store tablet running Cell Checkin or a similar Baker application.  *Id.* ¶ 75.  The tablet displayed a page with Herban Legends' logo at the top and Baker's logo at the bottom.  *Id.* ¶ 76.  After Cooperman tapped on that page, another page opened with text that read: "Enter your cell number."  *Id.*  That page also displayed both logos, and the following language appeared above the Baker logo:

> Message and data rates may apply.  Click here for [Terms and Conditions (]ToCs[)].  Consent is not a condition of purchase.  An autodialed marketing message will be sent to the number provided.  No purchase necessary.  Information collected in connection with this program will be used in accordance with the Baker Privacy Policy.

*Id.* (alterations in original).  The page provided hyperlinks to the TOCs and privacy policy, and

according to Plaintiffs, those documents related to Baker, not Herban Legends.  *Id.*  Further, tapping on the Baker logo on any of the pages opened a separate page that stated: "Baker. Baker is the leading software partner for dispensaries across the country.  Visit trybaker.com or email us at info@trybaker.com for more information!"  *Id.*; *see also id.*, Ex. 5.

Cooperman entered her cell number, which has a Kansas area code, into the application. FAC ¶¶ 76, 112.  She avers that this is the only time when and method by which she disclosed her cell number to Herban Legends.  *Id.* ¶¶ 78-79.  Between December 9, 2016 and October 25, 2018, Cooperman received at least 121 telemarketing texts from Herban Legends.  *Id.* ¶ 67; *see id.*, Ex. 3. The texts included messages like "IndigoPros are back in stock!! Get your favorite new Vape while supplies last! @herbanlegends 55 Bell st https://tbker.co/dm1v3."  *Id.*; *see id.*, Ex. 3.  Plaintiffs assert that the "vast majority" of the messages Cooperman received from Herban Legends contained hyperlinks to "tbkr.co," which in turn redirects to Baker's website, trybaker.com.  *Id.* ¶ 71. Cooperman alleges that she received at least one telemarketing text from Herban Legends while she was within the Northern District of California.  *Id.* ¶ 73.  These messages appeared to be sent from three different numbers, two of which were sent from a Washington area code while the third was a toll-free 844 number.  *Id.* ¶ 68.

### 3. California Dispensary

Komaiko visited Purple Star in San Francisco, California on February 24, 2015.  FAC ¶ 98. Plaintiffs aver that he completed a paper patient information form and entered his cell number on this form, but that the form did not include his prior express written consent to receive telemarketing texts from Purple Star.  *Id.* ¶ 99.  Komaiko asserts that the form he submitted during that visit was the only time he gave his number to Purple Star, and that he never provided valid prior express written consent to receive telemarketing texts from the dispensary.  *Id.* ¶¶ 100, 102.  According to Plaintiffs, sometime after Komaiko visited Purple Star but before he had received any telemarketing texts from that dispensary, Purple Star became Baker's client.  *Id.* ¶ 103.

After Baker engaged Purple Star as a client, Komaiko allegedly received at least 108 telemarketing texts from Purple Star between November 2, 2017 and April 17, 2018.  *Id.* ¶ 89; *see id.*, Ex. 6.  The texts contained messages such as "WELCOME TO PURPLE STAR MD.

United States District Court
Northern District of California

AMAZING COUPONS, DISCOUNTS, AND DEALS ARE COMING SOON. Message & Data Rates may apply. Periodic Messaging. Text STOP to end, text HELP for info. Terms of Use & Privacy Policy http://tbkr.co/tc." *Id.*, Ex. 6. The messages from Purple Star came from three different numbers: one was from area code 415, associated with San Francisco; one was an 844 number; and one was from area code 720, which is associated with Denver, Colorado. *Id.* ¶ 90. The last number was identical to the number Native Roots used to contact him. *Id.*

Komaiko alleges that he contacted Purple Star regarding the telemarketing texts he received from the dispensary, and Purple Star explained that he had provided the dispensary with prior express written consent to receive telemarketing texts from it when he used a Baker application at Native Roots. FAC ¶¶ 100, 109. According to Plaintiffs, Baker gave Purple Star the information Komaiko had given to Native Roots and provided advice to Purple Star about the legality of sending telemarketing texts to Komaiko. *Id.* ¶ 110.

### D.     Claims

Plaintiffs allege that they received the telemarketing texts without providing their prior express written consent in violation of the federal TCPA and California's UCL. Defendants now move to dismiss the claims under Rule 12(b)(2) on the basis that the court lacks personal jurisdiction over either Defendant and under Rule 12(b)(6) for failure to state a claim.

## II.     LEGAL STANDARDS

### A.     Rule 12(b)(2) Motions

"Where . . . there is no applicable federal statute governing personal jurisdiction, the district court applies the law of the state in which the district court sits." *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1205 (9th Cir. 2006). Because California's long-arm statute allows a court to exercise personal jurisdiction to the extent permitted by the Due Process Clause of the United States Constitution, "the jurisdictional analyses under state law and federal due process are the same." *Id.*; *see also* Cal. Civ. Proc. Code § 410.10 ("A court of this state may exercise jurisdiction on any basis not inconsistent with the Constitution of this state or of the United States.").

In a motion to dismiss for lack of personal jurisdiction, the non-moving party "bears the

burden of establishing that jurisdiction is proper." *Boschetto v. Hansing*, 539 F.3d 1011, 1015 (9th Cir. 2008). Where, as here, a district court rules on a motion to dismiss without holding an evidentiary hearing, the non-moving party "need only demonstrate facts that if true would support jurisdiction over the defendant." *Ballard v. Savage*, 65 F.3d 1495, 1498 (9th Cir. 1995). "[U]ncontroverted allegations in the complaint must be taken as true . . . [and] [c]onflicts between parties over statements contained in affidavits must be resolved in the plaintiff's favor." *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004).

**B.    Rule 12(b)(6) Motions**

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the claims alleged in the complaint. *See Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995). When reviewing a motion to dismiss for failure to state a claim, the court must "accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam) (citation omitted), and may dismiss a claim "only where there is no cognizable legal theory" or there is an absence of "sufficient factual matter to state a facially plausible claim to relief." *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009); *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001)) (quotation marks omitted). A claim has facial plausibility when a plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citation omitted). In other words, the facts alleged must demonstrate "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 555 (2007) (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)); *see Lee v. City of L.A.*, 250 F.3d 668, 679 (9th Cir. 2001), overruled on other grounds by *Galbraith v. Cty. of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002).

As a general rule, a court may not consider "any material beyond the pleadings" when ruling on a Rule 12(b)(6) motion. *Lee*, 250 F.3d at 688 (citation and quotation marks omitted). However, "a court may take judicial notice of 'matters of public record,'" *id*. at 689 (citing *Mack v. S. Bay Beer Distrib.*, 798 F.2d 1279, 1282 (9th Cir. 1986)), and may also consider "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not

United States District Court
Northern District of California

8

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

physically attached to the pleading," without converting a motion to dismiss under Rule 12(b)(6) into a motion for summary judgment. *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994), *overruled on other grounds by Galbraith*, 307 F.3d at 1125-26. The court need not accept as true allegations that contradict facts which may be judicially noticed. *See Mullis v. U.S. Bankr. Court*, 828 F.2d 1385, 1388 (9th Cir. 1987).

## III.    DISCUSSION

### A.    Rule 12(b)(2) Motion

Personal jurisdiction may be either general or specific. *Bristol-Myers Squibb Co. v. Sup. Ct. Cal., San Francisco Cty.*, 137 S. Ct. 1773, 1780 (2017). "For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile; for a corporation, it is an equivalent place, one in which the corporation is fairly regarded as at home." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924 (U.S. 2011). Plaintiffs do not assert nor do the pleadings support the existence of general jurisdiction over either Defendant. Accordingly, the only issue is whether the court may exercise specific jurisdiction over Baker and TILT. Where a party is not subject to general jurisdiction, due process requires that a defendant have "certain minimum contacts with it such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (internal quotations omitted). The Ninth Circuit uses a three-part test to analyze whether a party's "minimum contacts" comport with the doctrine articulated in *International Shoe*:

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;
>
> (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and
>
> (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Schwarzenegger*, 374 F.3d at 802. "The plaintiff bears the burden of satisfying the first two prongs of the test." *Id.* (citing *Sher v. Johnson*, 911 F.2d 1357, 1361 (9th Cir. 1990)). If the plaintiff meets

United States District Court
Northern District of California

its burden on the first two prongs, "the burden then shifts to the defendant to 'present a compelling case' that the exercise of jurisdiction would not be reasonable." *Id.* (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476-78 (1985)).  If any of the three factors are not met, "jurisdiction in the forum would deprive the defendant of due process of law." *Omeluk v. Langsten Slip & Batbyggeri A/S*, 52 F.3d 267, 270 (9th Cir. 1995).

As Defendants point out and Plaintiffs acknowledge, all of Plaintiffs' allegations relate to Baker, not TILT.  Plaintiffs' arguments with respect to personal jurisdiction over TILT rely entirely on the corporate relationship between Baker and TILT.  Accordingly, the court first analyzes personal jurisdiction over Baker and then turns to the question of whether it can exercise personal jurisdiction over TILT.

### 1.  Purposeful Direction and the *Calder* Test

Under the first prong of the specific jurisdiction test, purposeful availment and purposeful direction are distinct concepts.  *Schwarzenegger*, 374 F.3d at 802.  Purposeful availment is most often used in cases related to contract disputes, and purposeful direction is used in cases, such as this consumer protection class action, that sound in tort.  *Id.*  Purposeful direction is analyzed under the three-part test derived from *Calder v. Jones*, 465 U.S. 783 (1984): "that the defendant allegedly ha[s] (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Dole Food Co. v. Watts*, 303 F.3d 1104, 1111 (9th Cir. 2002).  The *Calder* test is appropriate here because TCPA actions are "essentially . . . tort claim[s]." *Schlesinger v. Collins*, No. 19-cv-03483-EMC, 2019 WL 4674396, at *2 (N.D. Cal. Sept. 25, 2019); *see also Moser v. Health Ins. Innovations, Inc.*, 2018 WL 325112, at *3 (S.D. Cal. Jan. 5, 2018) ("[C]ases brought under the TCPA sound in tort . . . .").

### a.  Intentional Act

In the Ninth Circuit, an "intentional act" is an "an external manifestation of the actor's intent to perform an actual, physical act in the real world, not including any of its actual or intended results." *Washington Shoe Co. v. A-Z Sporting Goods Inc.*, 704 F.3d 668, 674 (9th Cir. 2012) ("*Washington Shoe*"), *abrogation on other grounds recognized by Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d 1064 (9th Cir. 2017).  With respect to this prong of the *Calder* test, Plaintiffs

allege that Baker performed several acts that were expressly aimed at California, including: (1) sending text messages on behalf of Purple Star from a number with a San Francisco area code; (2) "engaging client dispensaries in California and serving them by sending text messages on their behalves"; (3) sending agents to California to host a booth at a trade show; (4) training specialists to serve its California clients, such as Purple Star; (5) having a CEO who split his time between San Francisco and Denver during the time period of the events underlying the complaint; and (6) maintaining websites on behalf of California clients that sell exclusively to California residents. These facts go to both the first and second part of the *Calder* test, but will be addressed separately. Baker responds that their clients, and not Baker, sent the text messages and that the court cannot assert personal jurisdiction over Baker due to the intentional acts of its clients. Baker's responses to the remaining facts cited by Plaintiffs go to the second and third prong of the test and will likewise be addressed in those sections.

The parties heavily dispute whether Baker or its clients "sent" the text messages. The court need not resolve this dispute for the purposes of personal jurisdiction, however, since Plaintiffs adequately allege (and Baker does not rebut) numerous intentional acts by Baker. Whether those acts were directed at California or sufficiently related to Plaintiffs' claims are addressed below.

### b.    Express Aiming and Resulting Harm

The second and third prong of the *Calder* test requires that the non-forum defendant "expressly aimed" the intentional act(s) at the forum state, causing harm that the defendant "knows is likely to be suffered in the forum state." *Dole Food Co.*, 303 F.3d at 1111. With respect to at least the claims arising from Plaintiffs' encounters with the dispensaries in Washington and Colorado, Baker argues that Plaintiffs only allege conduct against them as individuals and not acts targeted at California itself.

The Supreme Court has established that the "express aiming" prong requires a showing that "the defendant's conduct connects him to the *forum* in a meaningful way," not merely to a forum resident. *Walden v. Fiore*, 571 U.S. 277, 290 (2014), the 571 U.S. at 278 (emphasis added); *see also Morrill v. Scott Fin. Corp.*, 873 F.3d 1136, 1148 (9th Cir. 2017) ("Plaintiffs were required to make a prima facie showing that Defendants' alleged actions were directed at [the forum state], not

11

just at individuals who reside there."). In TCPA actions, courts have consistently held that the second and third prongs of the *Calder* test are satisfied when defendants contact numbers with area codes associated with that state. *See Schlesinger*, 2019 WL 4674396, at *2 (citing cases); *Moser v. Health Ins. Innovations, Inc.*, 2018 WL 325112, at *4 (S.D. Cal. Jan. 5, 2018) ("The effects test is satisfied by a plaintiff's uncontroverted allegation that a defendant violated the TCPA by calling a phone number with a forum state area code."). *Schlesinger* observed that these cases are consistent with *Walden* because "target[ing] California telephone numbers (and presumably residents of California) . . . inflict[s] harm within this state." 2019 WL 4674396, at *2. By contrast, courts have declined to find personal jurisdiction over TCPA defendants when they had no reason to know that their conduct would be felt in California. In *Abedi v. New Age Med. Clinic PA*, 2018 WL 3155618 (E.D. Cal. June 25, 2018), for example, the plaintiff received services from a New Jersey corporation in New Jersey; the defendant did not do any business outside of New Jersey; the plaintiff gave the defendant a non-California phone number; and the plaintiff did not inform the corporation that she had moved from New Jersey to California. 2018 WL 3155618, at *5. The court there held that it was not enough for the plaintiff to show that she received text messages from the defendant while she was located in Merced, California: "Of critical importance, the cell phone number provided to [the defendant] by [the plaintiff] was for a non–California number . . . . There is nothing before the Court that suggests in any way that [the defendant] either knew or should have known that its text messages were sent into California and received by a resident of Merced." *Id.*

The reasoning in *Abedi* applies to the texts Plaintiffs received from the non-California dispensaries. Komaiko visited two Colorado dispensaries and provided his Illinois number, while Cooperman visited a dispensary in Washington and provided her Kansas number. None of these allegations suggest that Baker had any reason to know that the text messages from those dispensaries were sent into California. Even assuming that Baker knew its non-California dispensaries would likely send at least some messages to California residents, and that not every California resident has a California number, mere knowledge of the statistical probability that its activities will have some impact in California is too attenuated to support the exercise of personal jurisdiction in this state. *See Morrill*, 873 F.3d at 1145 ("[T]o establish the basis for specific personal jurisdiction, a tort must

1   involve the forum state itself, and not just have some effect on a party who resides there."); *see also*

2   *Walden*, 571 U.S. at 290 ("The proper question is not where the plaintiff experienced a particular

3   injury or effect but whether the defendant's conduct connects him to the forum in a meaningful

4   way."). Accordingly, Plaintiffs have not met their burden to show that Baker's alleged conduct in

5   sending/facilitating unsolicited text messages from non-Californian dispensaries to non-Californian

6   numbers was expressly aimed at this state.

7       By contrast, Baker's activities in relation to Purple Star establish a stronger connection to

8   California. Plaintiffs allege, and Baker does not dispute, that Baker solicits business from client

9   dispensaries in California; trains specialists to specifically assist California clients; and provides

10  services specific to California, such as maintaining interactive websites that sell products

11  exclusively to California clients. Further, the majority of numbers collected by California

12  dispensaries through Baker's applications likely belong to California residents. Therefore, texts

13  sent to those numbers in violation of the TCPA will largely cause harm in California.

14      In sum, Plaintiffs have not met their burden to show that Baker expressly aimed conduct at

15  California through the text messages sent to non-California numbers from non-California

16  dispensaries. However, they have made a prima facie case that Baker purposefully directed conduct

17  at California through its solicitation of business from Californian dispensaries like Purple Star.

18  Whether Komaiko's claims are sufficiently related to Baker's contacts with Purple Star is the subject

19  of the next section.

20              **2.      Forum-Related Activities**

21      In order to establish that the forum state has personal jurisdiction over a defendant, the

22  plaintiff's claim "must be one which arises out of or relates to the defendant's forum-related

23  activities." *Schwarzenegger*, 374 F.3d at 802 (citation omitted). Baker lists some of its alleged

24  contacts with California and summarily asserts that "[t]hese allegations have no relationship to

25  Plaintiffs' TCPA and UCL claims, and they cannot form the basis for specific jurisdiction over

26  Baker." Mot. at 15.

27      Baker's argument is unconvincing. First, Baker construes the complaint to allege only three

28  contacts with California: that (1) Milton "split[] his time between Denver, Colorado and San

United States District Court
Northern District of California

Francisco, California" during the relevant time period; (2) Baker hosted a booth at a California trade show for cannabis businesses; and (3) Baker received funding from California-based venture capital firms to expand its operations in California.  However, as explained above, the complaint details other contacts between Baker and California: namely, that it solicits business from Californian cannabis dispensaries; trains specialists to specifically assist California clients; and provides services specific to California, such as maintaining interactive websites that sell products exclusively to California customers.  Second, the Ninth Circuit has held that "[t]he second prong of the specific jurisdiction test is met if 'but for' the contacts between the defendant and the forum state, the cause of action would not have arisen." *Terracom v. Valley Nat. Bank*, 49 F.3d 555, 561 (9th Cir. 1995).  Komaiko alleges that Purple Star collected his cell number during his in-person visit to the Californian dispensary.  Baker points out that Purple Star was not one of its clients when the dispensary collected Komaiko's cell number, but Komaiko alleges that he began receiving texts from Purple Star only *after* it became a Baker client.  For the purposes of establishing personal jurisdiction, a defendant's contacts with the forum state are measured "prior to the event causing the litigation." *Farmers Ins. Exch. v. Portage La Prairie Mut. Ins. Co.*, 907 F.2d 911, 913 (9th Cir. 1990).  The alleged misconduct in this case was not taking Komaiko's information in the first place; it was using that information to send him unsolicited telemarketing messages.  Since Baker's contacts with Purple Star were established prior to the alleged unlawful texts, and the complaint alleges that Komaiko received texts from Purple Star because it became a Baker client, Komaiko has sufficiently pleaded that Baker's forum-related conduct were the "but for" cause of his alleged harm.

Therefore, Baker's contacts with Purple Star may serve as the basis for exercising personal jurisdiction over Baker in California.[3]

---

[3] At the hearing, Baker argued that Cooperman alleges no relevant contacts with California and so there is not personal jurisdiction over Baker with respect to her claims.  The court disagrees.  The Ninth Circuit recognizes pendent personal jurisdiction, such that "a court may assert pendent personal jurisdiction over a defendant with respect to a claim for which there is no independent basis of personal jurisdiction so long as it arises out of a common nucleus of operative facts with a claim in the same suit over which the court does have personal jurisdiction." *Action Embroidery Corp. v. Atl. Embroidery, Inc.*, 368 F.3d 1174, 1180 (9th Cir. 2004).  The exercise of pendent personal jurisdiction is particularly appropriate in putative nationwide class actions, like the present case. *See Sloan v. Gen. Motors LLC*, 287 F. Supp. 3d 840, 861 (N.D. Cal. 2018).  Therefore, even if

United States District Court
Northern District of California

### 3.   Fair Play and Substantial Justice

The third and final prong of the specific jurisdiction analysis looks at "whether the exercise of jurisdiction . . . comport[s] with fair play and substantial justice, i.e. it must be reasonable." *Schwarzenegger*, 374 F.3d at 802; *see also Burger King*, 471 U.S. at 467-77 ("Once it has been decided that a defendant purposefully established minimum contacts within the forum State, these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with 'fair play and substantial justice'").   The Ninth Circuit considers the following factors relevant to the reasonableness inquiry:

> (1) the extent of the defendants' purposeful interjection into the forum state's affairs; (2) the burden on the defendant of defending in the forum; (3) the extent of conflict with the sovereignty of the defendants' state; (4) the forum state's interest in adjudicating the dispute; (5) the most efficient judicial resolution of the controversy; (6) the importance of the forum to the plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative forum.

*Core-Vent Corp. v. Nobel Indus. AB*, 11 F.3d 1482, 1487–88 (9th Cir. 1993).   "None of the factors is dispositive in itself; instead, we must balance all seven." *Id.* at 1488.   On this prong, it is the defendant's burden to "present a compelling case that the exercise of jurisdiction would not be reasonable." *Schwarzenegger*, 374 F.3d at 802 (internal quotation marks and citation omitted). There is a presumption of reasonableness where the defendant takes actions to "solicit and obtain business in California." *Sinatra v. Nat'l Enquirer, Inc.*, 854 F.2d 1191, 1201 (9th Cir. 1988).

#### a.   Purposeful Interjection

Baker has contacts with California through its California dispensary clients.   In its Listing Statement with the Canadian Securities Exchange, TILT claimed that Baker is the "industry-leading CRM platform" and that it held approximately 32% of the U.S. market share with respect to cannabis dispensaries as of June 30, 2018.   Listing Statement at 52.   TILT also stated that Baker "generates most of its revenue from sales in Colorado, California, and Washington." *Id.*   Approximately 23%

---

Cooperman's claims would not provide an independent basis for personal jurisdiction, the court has jurisdiction over those claims because they arise from a common nucleus of operative facts with claims over which the court has personal jurisdiction.

of Baker's 2017 revenue was generated from sales in California. *Id.* at 456.[4]  The extent of Baker's involvement with California is significant.  *See Harris Rutsky & Co. Ins. Servs. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1132 (9th Cir. 2003) (finding that the defendant's contacts with California were "fairly extensive" because it conducted 20% of its business in California).

Therefore, this factor weighs strongly in favor of Plaintiffs.

### b.       Burden on Defendant

The second factor considers the burden on the defendant in defending itself in the forum state.  This factor is not given significant weight, since "modern advances in communications and transportation have significantly reduced the burden of litigating" in a non-home forum.  *Sinatra*, 854 F.2d at 1199.  This is particularly true when the defendant is a citizen of another state rather than from a foreign country.  *SMS Signature Cars, Inc. v. Arrington Engines, Inc.*, 2011 WL 13225291, at *13 (C.D. Cal. May 20, 2011) ("[G]iven that . . .  modern advances have reduced the burden of litigating abroad, they certainly have alleviated the burden of litigating in another state.").  This factor is also less compelling when the defendant is a corporation rather than an individual.  *Id.* ("[T]he difference in the burden placed on an individual versus a large corporation to travel out of state is significant."); *see Core-Vent*, 11 F.3d at 1489 (noting that the burden of litigating in a foreign forum is typically less substantial for corporate parties than for individuals).  In this case, Baker is a Delaware corporation and will not face significant difficulties in litigating in California.

In sum, this factor weighs only slightly in favor of Baker.

### c.       Sovereignty

The third factor looks at the "extent of conflict with the sovereignty of the defendant's state." *Core-Vent*, 11 F.3d at 1489.  This factor is not particularly salient in a dispute between U.S. citizens. *Sinatra*, 854 F.2d at 1199 ("[L]itigation against an alien defendant creates a higher jurisdictional barrier than litigation against a citizen from a sister state . . . ."); *Gray & Co. v. Firstenberg Mach. Co.*, 913 F.2d 758, 761 (9th Cir. 1990) (finding that, where the alternative forum is also within the United States, "any conflicting sovereignty interests are best accom[m]odated through choice-of-

---

[4] This is the page number as generated by ECF, since the indices to the Listing Statement are not easily referenced.

16

United States District Court
Northern District of California

law rules rather than jurisdictional rules").  Further, a conflict of sovereignty between states does not arise where the claims are largely federal.  *Avaya Inc. v. Pearce*, No. 19-cv-00565-SI, 2019 WL 6311383, at \*10 (N.D. Cal. Nov. 25, 2019).  Baker concedes that the exercise of personal jurisdiction in California would not create a conflict with the sovereignty of its home state.  Opp. at 16.

This factor is neutral.

### d.      Forum State's Interest

"California maintains a strong interest in providing an effective means of redress for its residents . . . ."  *Sinatra*, 854 F.2d at 1200.  Here, Plaintiffs are California citizens who allege injury as a result of Baker's unlawful conduct.  *j2 Glob. Commc'ns, Inc. v. Blue Jay, Inc.*, No. 08-cv-4254-PJH, 2009 WL 29905, at \*10 (N.D. Cal. Jan. 5, 2009) (finding that California has a strong interest in protecting its residents from violations of the TCPA).

This factor weighs in favor of Plaintiffs.

### e.      Efficient Resolution

In considering which forum could resolve this dispute most efficiently, the court focuses on the location of the evidence and witnesses.  *Harris Rutsky*, 328 F.3d at 1133.  Baker points out that Plaintiffs are seeking to represent a nationwide class, and that the Supreme Court has not settled the question of whether a federal court exercising specific jurisdiction over a defendant may adjudicate the claims of non-resident class members.  Mot. at 17 (citing *Bristol-Myers*, 137 S. Ct. at 1776).  It claims that the case will be delayed by litigating that question in this court, whereas there would be no such dispute in Colorado since that state has general jurisdiction over Baker.  *Id.*

Baker essentially asserts that it will make resolution of this case less efficient in California through its own litigation strategy.  It says nothing about the location of witnesses or evidence, which is what the court must consider for this factor.  At least some witnesses are present in California, including the named Plaintiffs and Purple Star, and the evidence held by those witnesses is also located here.  While there are likely witnesses and evidence outside of California, Baker has raised no argument that it would be less efficient to conduct out-of-state discovery here than in Colorado.  In addition, this factor has also become less important in light of "modern advances in communication and transportation."  *Avaya*, 2019 WL 6311383, at \*10 (quoting *Harris Rutsky*, 328

F.3d at 1133).

This factor is neutral.

### f.      Plaintiffs' Interests

Plaintiffs unquestionably have an interest in bringing this case in their home state; however, "the plaintiff's convenience is not of paramount importance." *Dole Food*, 303 F.3d at 1116; *see Core-Vent*, 11 F.3d at 1490.

Therefore, this factor weighs only slightly in favor of Plaintiffs.

### g.      Alternative Forum

"Plaintiffs bear the burden of proving the unavailability of an alternative forum." *Freestream Aircraft (Bermuda) Ltd. v. Aero Law Grp.*, 905 F.3d 597, 609 (9th Cir. 2018). Plaintiffs do not contest that Colorado is an alternative forum.

This factor weighs in favor of Baker.

### h.      Balance of Factors

Two of the reasonableness factors weigh in favor of Baker, three favor Plaintiffs, and two are neutral. The Ninth Circuit has held that, where the balance of factors is close, the defendants have not met their burden on the third prong. *Roth v. Garcia Marquez*, 942 F.2d 617, 625 (1991) ("[Defendants] may be able to show that the exercise of jurisdiction might be unreasonable, but the closeness of the question manifests that they cannot do so in a compelling fashion.") (finding the exercise of personal jurisdiction was reasonable where only two of the seven factors favored the plaintiff); *Harris Rutsky*, 328 F.3d at 1134 (finding the reasonableness prong met where four of the seven factors favored the defendant). Since Plaintiffs met their burden as to the first two prongs of the specific jurisdiction test, there is a presumption of reasonableness and the burden is on Baker to rebut the presumption with a compelling case. *See Roth*, 942 F.2d at 625. It has not done so here.

Accordingly, Defendants' Rule 12(b)(2) motion is denied as to Baker.

### 4.      Personal Jurisdiction over TILT

Having determined that it may exercise personal jurisdiction over Baker, the court now addresses whether TILT is also subject to personal jurisdiction in this state. *Calder*, 465 U.S. at 790 ("Each defendant's contacts with the forum State must be assessed individually."). Plaintiffs have

United States District Court
Northern District of California

not pleaded any independent acts by TILT; instead, they assert that TILT is subject to personal jurisdiction in California because the companies merged in 2018 and TILT became a successor to Baker.  Opp. at 10.  In support of this claim, they point to the allegations in the complaint and a press release by TILT that describes the BCA as a "merger."  *See* FAC ¶¶ 114-21; *id.*, Ex. 9. Defendants assert that they did not merge in 2018; instead, Baker merged with TILT US and later became an indirect subsidiary of TILT through Jimmy Jang.  Milton Decl. ¶ 9.

"[A]s a general rule, where a parent and a subsidiary are separate and distinct corporate entities, the presence of one . . . in a forum state may not be attributed to the other."[5]  *Holland Am. Line Inc. v. Wartsila N. Am., Inc.*, 485 F.3d 450, 459 (9th Cir. 2007).  By contrast, "[a] court has personal jurisdiction over an alleged successor company . . . if: (i) the court would have had personal jurisdiction over the predecessor and (ii) the successor company effectively assumed the subject liabilities of the predecessor."  *Lefkowtiz v. Scytl USA*, No. 15-CV-05005-JSC, 2016 WL 537952, at *3 (N.D. Cal. Feb. 11, 2016) (internal quotation marks and citations omitted).  Notably, most of Plaintiffs' arguments regarding successor liability are addressed in response to Defendants' Rule 12(b)(6) motion.  Unlike a motion to dismiss for failure to state a claim, where the court accepts as true all adequately pleaded allegations in the complaint, a court ruling on a motion under Rule 12(b)(2) "may not assume the truth of allegations in a pleading which are contradicted by affidavit." *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1223 (9th Cir. 2011) (citation omitted). As detailed above, the declaration of Joel Milton, the BCA, and the Listing Statement (which was submitted by Plaintiffs) all describe the series of transactions whereby Baker merged with TILT US and became a subsidiary of TILT.  Plaintiffs do not dispute the accuracy of these documents or explain how Baker's merger with TILT's subsidiary constitutes a merger with TILT.

Even if Plaintiffs sufficiently established that TILT is Baker's successor, which they did not, a successor generally does not assume liability for its predecessor's liabilities unless one of the following four exceptions applies:

(1) the successor expressly or impliedly agrees to assume the subject

---

[5] An exception to the general rule is the alter ego theory of liability, which Plaintiffs do not assert here. *See Ranza v. Nike, Inc.*, 793 F.3d 1059, 1070 (9th Cir. 2015).

United States District Court
Northern District of California

> liabilities; (2) the transaction amounts to a consolidation or merger of the successor and the predecessor (*de facto* merger); (3) the successor is a mere continuation of the predecessor; or (4) the transfer of assets to the successor is for the fraudulent purpose of escaping liability for the predecessor's debts.

*Lefkowitz*, 2016 WL 537952, at *4. Plaintiffs have not offered any argument that the fourth exception applies here; accordingly, the court only addresses the first three exceptions.

### a.   Assumption of Liabilities

The FAC summarily asserts that "[a]s a result of the Merger [between TILT and Baker], Tilt assumed the liabilities of Baker." FAC ¶ 122. Neither the FAC nor Plaintiffs' opposition cites any specific facts in support of this assertion. In *No Cost Conference, Inc. v. Windstream Commc'ns, Inc.*, 940 F. Supp. 2d 1285 (S.D. Cal. 2013), the court found that the plaintiff did not adequately plead the applicability of the first exception where it made a conclusory allegation that the defendants "assumed all right and responsibilities . . . as the successor in interest [to the predecessor]." 940 F. Supp. 2d at 1299. In so holding, the court stated that a plaintiff must "plead the existence of a contract [and] its terms which establish the obligation [in] issue." *Id.* (internal quotation marks omitted) (alterations in original); *see also Winner Chevrolet, Inc. v. Universal Underwriters Ins. Co.*, 2008 WL 2693741, at *4 (E.D. Cal. July 1, 2008) ("[P]laintiffs here must not only plead the existence of an assumption of liability but either the terms of that assumption of liability (if express) or the factual circumstances giving rise to an assumption of liability (if implied).").

Here, Plaintiffs do not cite to anything in the BCA, Listing Statement, or any other document that references TILT's assumption of Baker's liabilities. Nor do they plead factual circumstances that give rise to an assumption of liability. Plaintiffs' barebones assertions would be insufficient to pass muster under a Rule 12(b)(6) motion and are even less adequate to meet their burden under a Rule 12(b)(2) analysis.

### b.   *De Facto* Merger

"The *de facto* merger doctrine applies under California law when 'one corporation takes all of another's assets without providing any consideration that could be made available to meet claims of the other's creditors' or when 'the consideration consists wholly of shares of the purchaser's stock

United States District Court
Northern District of California

which are promptly distributed to the seller's shareholders in conjunction with the seller's liquidation.'" *Schwartz v. Pillsbury Inc.*, 969 F.2d 840, 846 (9th Cir. 1992) (quoting *Ray v. Alad Corp.*, 19 Cal. 3d 22, 28 (1977)). Again, Plaintiffs have not pleaded (much less offered evidence) that TILT absorbed all of Baker's assets or that Baker liquidated. *See Lefkowitz*, 2016 WL 537952, at *4 ("[T]here are no facts from which the Court can reasonably infer that [the defendant] was liquidated . . . ."). Further, "a de facto merger requires a showing that the purchaser paid inadequate consideration for the seller's assets." *Sunnyside Dev. Co., LLC v. Opsys Ltd.*, No. 05-cv-0553-MHP, 2007 WL 2462142, at *9 (N.D. Cal. Aug. 29, 2007). Plaintiffs have not pleaded any facts tending to show that TILT purchased *any* assets from Baker, much less that TILT did not provide adequate consideration for them.

Accordingly, Plaintiffs have not plausibly alleged that this exception applies.

### c.      Mere Continuation Theory

The mere continuation theory is premised on the basis that "corporations cannot escape liability by a mere change of name or a shift of assets when and where it is shown that the new corporation is, in reality, but a continuation of the old." *Pool v. F. Hoffman-La Roche, Ltd.*, 386 F. Supp. 3d 1202, 1213 (N.D. Cal. 2019) (quoting *Cleveland v. Johnson*, 209 Cal. App. 4th 1315, 1327 (2012)). California courts "generally hold that successor liability based on continuation is not established 'where the selling and purchasing corporations were completely separate and distinct entities both before and after sale.'" *Sunnyside*, 2007 WL 2462142, at *10. Plaintiffs do not dispute that Baker continues to exist separately from TILT. Instead, they argue that courts have still found successor liability even in those cases, but the authority upon which they rely is inapposite. In *Pool v. F. Hoffman-La Roche, Ltd.*, 386 F. Supp. 3d 1202 (N.D. Cal. 2019), the predecessor company had a contract to sell certain pharmaceuticals to the U.S. military. *Id.* at 1214. It transferred that entire line of business to its alleged successor, although it otherwise continued as its own entity. *Id.* at 1214-15. The court determined that successor liability could apply with respect to a specific line of business. *See id.* at 1215. Here, Plaintiffs have offered no facts to support that TILT is a successor with respect to a line of business originally operated by Baker. The other case Plaintiffs cite addresses situations where an alleged successor acquires the substance of its predecessor but the

predecessor "continues to exist as a shell corporation." *Societe Anonyme Dauphitex v. Schoenfelder Corp.*, 2007 WL 3253592, at \*5 (S.D.N.Y. Nov. 2, 2007).  Plaintiffs' allegations do not suggest that Baker is a mere corporate shell for TILT.

Further, the "basic premise underlying the [successor] theory is that a business should not be allowed to defraud its creditors by simply changing its form." *Hargrove & Costanzo v. United States*, 2007 WL 2409590, at \*4 (E.D. Cal. Aug. 21, 2007); *see also Garcia v. New Albertson's, Inc.*, 2014 WL 4978434, at \*11 (C.D. Cal. Oct. 3, 2014) (explaining that the "principle underlying successor liability" is preventing corporations from re-organizing to avoid their debts).  Plaintiffs have not alleged or presented evidence that Baker is unable to satisfy its debts because of its corporate relationship with TILT.  The policies underlying the successor theory of liability are not implicated in this case.

In sum, Plaintiffs have not made a prima facie case that jurisdiction over TILT is proper. Defendants' Rule 12(b)(2) motion is granted as to TILT.

### 5.   Jurisdictional Discovery

Plaintiffs request the opportunity to conduct discovery on the jurisdictional issue.  A court may permit jurisdictional discovery "where pertinent facts bearing on the question of jurisdiction are controverted or where a more satisfactory showing of the facts is necessary." *Data Disc, Inc. v. Sys. Tech. Assocs., Inc.*, 557 F.2d 1280, 1285 n. 1 (9th Cir. 1977).  Courts in this district have held that "a plaintiff need not establish a prima facie case of personal jurisdiction before it can obtain jurisdictional discovery." *Teras Cargo Transp. (Am.), LLC v. Cal Dive Int'l (Australia) Pty Ltd.*, No. 15-cv-03566-JSC, 2015 WL 6089276, at \*8 (N.D. Cal. Oct. 16, 2015) (citing cases).  A court may grant jurisdictional discovery if the request is based on more than a "hunch that it might yield jurisdictionally relevant facts," *see Boschetto*, 539 F.3d at 1020, or more than "bare allegations in the face of specific denials." *See Terracom v. Valley Nat'l Bank*, 49 F.3d 555, 562 (9th Cir. 1995) (citation omitted); *see also Calix Networks, Inc. v. Wi-Lan, Inc.*, No. 09-cv-06038-CRB (DMR), 2010 WL 3515759, at \*4 (N.D. Cal. Sept. 8, 2010) ("[A] plaintiff must present a colorable basis for jurisdiction, or some evidence constituting a lesser showing than a prima facie case." (quotations omitted)).  It is not an abuse of discretion to deny jurisdictional discovery "when it is

clear that further discovery would not demonstrate facts sufficient to constitute a basis for jurisdiction." *Wells Fargo & Co. v. Wells Fargo Exp. Co.*, 556 F.2d 406, 430 n. 24 (9th Cir. 1977).

Here, Plaintiffs' jurisdictional argument against TILT rests entirely on their claim that TILT and Baker "merged" in 2018. They have offered nothing in support other than a press release that obliquely references a "merger" in reference to the BCA. In contrast, Defendants have set forth specific and detailed facts regarding their corporate structure, as reflected in public documents whose authenticity Plaintiffs do not question. Plaintiffs did not identify anything in those documents that disproves Defendants' characterization of their parent-subsidiary relationship. Under these facts, Plaintiffs' arguments amount to no more than a "hunch" that jurisdictional discovery would uncover jurisdictionally relevant facts.

Accordingly, Plaintiffs' request to take additional discovery is denied.

**B.     Rule 12(b)(6) Motion**

Defendants move to dismiss the complaint for failure to state a claim under Rule 12(b)(6) because (1) Plaintiffs have not adequately pleaded Baker's liability under the TCPA; (2) Plaintiffs have not sufficiently alleged that TILT is liable under the TCPA; and (3) Plaintiffs' complaint does not adequately allege that Cooperman has standing under the UCL. Plaintiffs concede that Cooperman lacks standing to pursue a UCL claim and withdrew that claim as to her. Further, for the reasons stated above, the court dismisses the complaint against TILT for lack of personal jurisdiction. Therefore, the court considers only whether Plaintiffs have stated a claim against Baker for violations of the TCPA.

The TCPA makes it unlawful "for any person . . . to make a call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system ["ATDS"] or an artificial or prerecorded voice . . . to any telephone number assigned to a . . . cellular telephone service . . . ." 47 U.S.C. § 227(b)(1)(A)(iii); *see* 47 C.F.R. § 64.1200(a)(1) ("No person or entity may . . . initiate any telephone call . . . ."). The TCPA defines an ATDS as "equipment which has the capacity—(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1). The Ninth Circuit has held that "a text message is a 'call' within the meaning of the

1   TCPA." *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 952 (9th Cir. 2009).

2          In this motion, the parties primarily dispute the meaning of "making" or "initiating" a text

3   message under the TCPA.  Neither the TCPA nor implementing rules define "initiate"; however,

4   the FCC issued guidance on this question in 2015.  *In the Matter of Rules & Regulations*

5   *Implementing the Tel. Consumer Prot. Act of 1991*, 30 F.C.C. Rcd. 7961 (2015) ("2015 Guidance").

6   This court is "bound by the FCC's interpretations of the TCPA, unless those interpretations are

7   invalidated by a court of appeals." *Reardon v. Uber Techs., Inc.*, 115 F. Supp. 3d 1090, 1097 (N.D.

8   Cal. 2015).

9                  **1.      FCC Guidance**

10          In the 2015 Guidance, the FCC determined that the word "initiate" suggests a "direct

11   connection between a person or entity and the making of a call," and described some factors relevant

12   to deciding whether a "direct connection" exists:

13               [A] "direct connection between a person or entity and the making of a call"
                 can include "tak[ing] the steps necessary to physically place a telephone
14               call."  It also can include being "so involved in the placing of a specific
                 telephone call" as to be deemed to have initiated it.  Thus, we look to the
15               totality of the facts and circumstances surrounding the placing of a
                 particular call to determine: 1) who took the steps necessary to physically
16               place the call; and 2) whether another person or entity was so involved in
                 placing the call as to be deemed to have initiated it, considering the goals
17               and purposes of the TCPA. . . . Depending upon the facts of each situation,
                 these and other factors, such as the extent to which a person willfully
18               enables fraudulent spoofing of telephone numbers or assists telemarketers
                 in blocking Caller ID, by offering either functionality to clients, can be
19               relevant in determining liability for TCPA violations.  Similarly, whether a
                 person who offers a calling platform service for the use of others has
20               knowingly allowed its client(s) to use that platform for unlawful purposes
                 may also be a factor in determining whether the platform provider is so
21               involved in placing the calls as to be deemed to have initiated them.

22

23   30 F.C.C. Rcd. at 7980-81 (footnotes and citations omitted).  This non-exhaustive totality of the

24   circumstances test is to be applied in each specific case, "considering the goals and purposes of the

25   TCPA." 30 F.C.C. Rcd. at 7980.  The goals of the TPCA include "the protection of consumers from

26   the nuisance, invasion of privacy, cost, and inconvenience that autodialed and prerecorded calls

27   generate." *Wick v. Twilio Inc.*, No. C16-00914RSL, 2017 WL 2964855, at *3 n. 3 (W.D. Wash.

28   July 12, 2017); *see* 30 F.C.C. Rcd. at 7979-80.

United States District Court
Northern District of California

United States District Court
Northern District of California

The 2015 Guidance illustrates the meaning of "initiate" under the TCPA using three examples. First, the FCC examined YouMail, an app which "send[s] an automatic text in response to a voicemail left by someone who called the YouMail app user." 30 F.C.C. Rcd. at 7981. The FCC determined that YouMail was not the initiator of the texts because the app was purely "reactive in nature." *Id.* The YouMail app user "determines whether to send the auto-reply text messages, which categories of callers should receive auto-replies, how the user's name should appear in the auto-reply, and whether to include a message with the auto-reply . . . ." *Id.* The FCC noted that "YouMail exercises no discernible involvement in deciding whether, when, or to whom an auto-reply is sent, or what such an auto reply says . . . ." *Id.* It accordingly held that YouMail did not make or initiate the texts at issue, but merely had a causal role in the sending of the texts. *Id.* at 7982.

By contrast, the FCC found that Glide, an app that allows users to exchange video messages, initiated texts and was therefore liable under the TCPA. *Id.* Under the factual scenario examined by the FCC,[6] Glide automatically sent text message invites to all of a user's contacts unless the user affirmatively opted out. *Id.* The FCC noted that "the app user plays no discernible role in deciding whether to send the invitation text messages, to whom to send them, or what to say in them." *Id.* at 7983. It therefore determined that Glide, not its users, initiated the text invitations to the user's contacts. *Id.*

Finally, the FCC examined TextMe, an app that "allows users to send and receive text messages within the United States free of charge if both parties are app users." 30 F.C.C. Rcd. at 7983. A TextMe user can invite their contacts to join the app by selecting the contacts they want to invite. *Id.* TextMe then sends an invitational text to the selected contacts. *Id.* at 7984. The content of the invitational text is exclusively controlled by TextMe. *Id.* The FCC noted that TextMe's control over the content of the invitational texts indicated potential TCPA liability. *Id.* However, it balanced that control against the "extent to which the app user decides whether to initiate the invitational message," and concluded that ultimately the user—not TextMe—makes the affirmative

---

[6] The FCC's findings with respect to Glide were based on a hypothetical factual scenario because it was unclear what functionality the app actually offered.

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

choice to send the invitational texts.  *Id.*  In holding that TextMe was not subject to TCPA liability, the FCC stated:

> While we agree with commenters that TextMe's control of the content of the invitational text message is a reason for concern, and take into account the goals and purposes of the TCPA, we conclude that the app user's actions and choices effectively program the cloud-based dialer to such an extent that he or she is so involved in the making of the call as to be deemed the initiator of the call.

*Id.*  The FCC therefore decided that, like YouMail, TextMe merely had a causal role in sending the texts at issue.  *Id.*

The FCC rulings on YouMail and Glide are distinguishable from the facts of this case. Unlike YouMail, which the FCC determined was a passive and reactive service, Baker allegedly assists in crafting text messages that its client dispensaries then use to solicit business.  FAC ¶ 32. Thus, Baker has a more active role in texting dispensary customers than YouMail had in texting its users' contacts.  Plaintiffs' allegations about Baker are also not similar to those concerning Glide. The FCC determined that Glide users had "no discernible role" in deciding whether and to whom to send text messages, whereas Plaintiffs in this case acknowledge that Baker's clients collaborate with Baker in formulating and sending texts.  *See* FAC ¶ 33.  Therefore, the client dispensaries have more control than Glide users over whether and to whom texts are sent.

TextMe shares more similarities with Baker.  Like TextMe, Baker allegedly provides a platform by which its users can send text messages.  FAC ¶¶ 27-32.  In addition, Baker's clients, much like TextMe users, ultimately decide to send the message.  *See id.* ¶¶ 33.  In finding that TextMe was not subject to TCPA liability, the FCC relied heavily on the level of control exercised by TextMe's customers because the customers decide "whether to send an invitational message, to whom to send an invitational message, and when that invitational message is sent." 30 F.C.C. Rcd. at 7984.  In this case, the allegations in the complaint suggest a similarly high level of control by Baker's clients, since client dispensaries "generate text content" and "enter dates and times they want texts to be made/initiated."  FAC ¶ 33.  Moreover, the FCC found in favor of TextMe even though it *exclusively* controlled the content of the text messages.  Here, Baker allegedly "collaborates with client dispensaries" through suggesting text content (including deals and loyalty

programs), but the client dispensaries choose which messages to send.  *See id.* ¶¶ 33, 36.  Therefore, Baker exercises even less control over the content of messages than TextMe did.

Of the three 2015 Guidance examples, TextMe comes closest to the facts of this case. However, the analysis does not end there.  The FCC listed additional factors to consider when deciding whether an entity was "so involved in placing the call as to be deemed to have initiated it," including "the extent to which a person willfully enables fraudulent spoofing of telephone numbers or assists telemarketers in blocking Caller ID" and "whether a person who offers a calling platform service for the use of others has knowingly allowed its clients to use that platform for unlawful purposes."  30 F.C.C. Rcd. at 7980.  At least some of Plaintiffs' allegations suggest such conduct. They claim that Baker chooses the numbers from which the client dispensaries send text messages, and that the numbers are selected in a way to "prevent them from being filtered or rejected, and to mask the use of an ATDS."  FAC ¶ 43.  Plaintiffs also allege that Baker inaccurately conveys to client dispensaries that they can legally text the numbers gathered through their platform "without additional customer authorizations."  *Id.* ¶ 38.  The factors relating to fraud and enabling unlawful conduct are not showcased in the FCC example cases, and so the court turns to interpreting caselaw for guidance.

### 2.    Caselaw

*Wick* is instructive.  The plaintiff in *Wick* alleged that defendant Twilio's texting software "allows clients to create text messaging content to be stored on Twilio's hosted platform and that Twilio uses the stored content to automatically build and send text messages to specified numbers." 2017 WL 2964855, at *2.  Twilio allegedly created messages for its customers or "reassemble[d] content provided by customers to make it more palatable to carriers."  *Id.* at *4.  Twilio also chose "what number a message will be sent from in order to prevent messages from being filtered or rejected and to mask the source of the calls it initiates" and decided "the order and timing of messages to ensure that the rate at which they are received by the carrier stays below the carrier's spam filter threshold."  *Id.* at *2-4.  According to the plaintiff, Twilio "knows that its platform technology can be used to automatically send tens of thousands of text messages that violate the TCPA, has bragged that its customers have been able to spam mobile phones using its platform, and

United States District Court
Northern District of California

has failed to require its customers to certify that they are complying with the TCPA." *Id.* at *4. Applying the fact-based analysis in the FCC's 2015 Guidance, the court determined that these allegations were sufficient to plead that Twilio was "an active participant in developing the message the recipient ultimately receives." *Id.* at *4. Notably, it stressed Twilio's role in "controlling the initiation of the message (including line selection and timing) to avoid spam filters and hide the source of the call, and allowing, if not promoting, unsolicited text message campaigns on its platform." *Id.* at *4. In denying Twilio's motion to dismiss, the court observed that "the FCC has not created a blanket rule immunizing from TCPA liability cloud-based service providers that transmit third-party content." *Id.*

A recent case in this district reached a similar conclusion. *De la Cabada v. Ytel, Inc.*, Case No. 19-cv-07178-JSC, 2020 WL 1156909 (N.D. Cal. Mar. 10, 2020). In *De la Cabada*, the defendant Ytel, Inc. ("Ytel") provided a cloud-based text messaging and calling system. *Id.* at *1. One of its customers ("MJM") ran a gospel ministry and used Ytel's platform to send millions of unsolicited texts and calls that purportedly came from a prophet. *Id.* at *1-2. The plaintiffs were recipients of some of those contacts and sued Ytel. They alleged that Ytel played an "integral role" in the spam messages, including by selling MJM "custom short codes" and bulk phone numbers to avoid call blocking. *Id.* at *2-4. The plaintiffs also claimed that Ytel knew MJM was using its platform to violate the TCPA, since one of the plaintiffs had notified Ytel about a default judgment she had obtained against MJM in another TCPA action. *Id.* *5. Ytel moved to dismiss, arguing (among other things) that it did not initiate the texts and calls. Following the FCC's 2015 Guidance, the court determined that "[t]here are no factual allegations that plausibly support an inference that Ytel created the content of the communications, or determined when, how, and to whom the communications were sent." *Id.* at *4. However, it found that the plaintiffs' allegations "support a plausible inference that Ytel was aware of MJM's repeated TCPA violations and nonetheless continued to facilitate them . . . , including with spoofing and call blocking functionality." *Id.* at *5. It noted that Ytel advertised that it assists clients in "running campaigns that are [TCPA] compliant," and so its failure to investigate a claim against one of its clients suggested it was aware of the TCPA violations and did not take action. *Id.* at *5. The court accordingly held that the plaintiffs had

adequately alleged that Ytel was "so involved with the communications as to be deemed to have made them." *Id.* at *4.

Both *Wick* and *De la Cabada* relied heavily on the plaintiffs' allegations that the defendant platform engaged in fraud or knowingly enabled unlawful conduct. *De la Caboda* found a plausible inference of TCPA liability in the absence of any allegations that Ytel participated in choosing the timing, content, or recipients of the messages. In this case, Plaintiffs claim that Baker chooses the numbers the texts will be sent from in order to prevent the numbers from being filtered and to "mask the use of an ATDS."[7] According to Plaintiffs, Baker advises clients on the legality of using telemarketing texts and about how to comply with the TCPA. FAC ¶¶ 43, 104, 110, 152. The Baker application ran by Herban Legend linked to Baker's TOC and privacy policy. *Id.* ¶¶ 76-77. These allegations give rise to a plausible inference that Baker "knowingly allow[s] its client(s) to use [its] platform for unlawful purposes," including the sending of the text messages at issue in this case. *See* 30 F.C.C. Rcd. at 7980.

In sum, some of the factors articulated by the FCC favor Baker and some favor Plaintiffs. These factors must be weighed in light of the "goals and purposes of the TCPA," including protecting consumers from "the nuisance, invasion of privacy, cost, and inconvenience that autodialed and prerecorded calls generate." 30 F.C.C. Rcd. at 7879-80. Baker, as alleged by Plaintiffs, is more than a passive service platform. It represents itself as an "industry-leading CRM platform" that holds a significant market share of cannabis dispensaries in the United States. *See* Listing Statement at 52. According to Plaintiffs, Baker actively encourages its clients to engage in text-based marketing campaigns, helps shape their messaging strategy, and expands their advertising reach. *See* FAC ¶¶ 21-26, 32-35. It also holds itself out as TCPA-compliant and provides its clients with TOCs and privacy policies. *Id.* ¶¶ 43, 76-77, 104, 110, 152. Taking the allegations in the complaint as true, Baker is significantly involved in its clients' marketing efforts,

---

[7] Baker argues that it merely provides dispensaries with numbers that match their physical location and so its choice of numbers is not fraudulent. Mot. at 23. The court cannot determine, on a motion to dismiss, whether such conduct was designed to deceive, since that goes to the merits. Plaintiffs adequately allege that the numbers are chosen at least in part to avoid call blocking and disguise the automated nature of the text. For example, Plaintiffs allege that Mile High sent Komaiko texts from three different numbers. FAC ¶ 42. Using multiple numbers for the same dispensary suggests intent to evade call screening.

United States District Court
Northern District of California

including by collecting contact information, informing dispensary customers of their privacy rights, suggesting content, and storing and sending the messages.  It is plausible to infer that Baker would be aware when its services, which extend beyond its texting platform, are used to send unsolicited advertising texts.  Moreover, Baker's alleged strategies to avoid call-blocking give rise to a plausible inference that Baker is not merely aware that its clients engage in such conduct, it actively supports it.  It would not serve the purposes of the TCPA to allow Baker to encourage the proliferation of text campaigns while knowingly permitting or willfully enabling its clients to violate the TCPA.

Considering the totality of the circumstances, Plaintiffs' allegations regarding the extent of Baker's involvement in its clients' telemarketing text campaigns raise a plausible inference that Baker initiated the texts received by Plaintiffs.  Accordingly, Baker's motion to dismiss the complaint on this basis is denied.

## IV.  CONCLUSION

For the reasons stated above, Defendants' motion to dismiss under Rule 12(b)(2) is granted as to TILT and denied as to Baker.  Defendants' Rule 12(b)(6) motion is denied.

The court will hold a case management conference on June 3, 2020 at 1:30 p.m.  The parties shall file an updated joint case management statement by May 27, 2020.


**IT IS SO ORDERED.**

Dated: April 42.'4242

_____

Donna M. Ryu
United States Magistrate Judge

United States District Court
Northern District of California